2012 ME 55

**STATE of Maine**

v.

**Jack D. BAILEY II.**

Supreme Judicial Court of Maine.

Argued: Nov. 8, 2011.

Decided: April 12, 2012.

F. David Walker, IV, Esq. (orally), Rudman & Winchell, Bangor, for appellant Jack D. Bailey, II.

R. Christopher Almy, District Attorney, and Susan J. Pope, Asst. Dist. Atty., Prosecutorial District V, Bangor, Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority: SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and JABAR, JJ.

Dissent/Concurrence: LEVY and SILVER, JJ.

JABAR, J.

[¶ 1] Jack D. Bailey II appeals from a judgment of conviction of ten counts of gross sexual assault (Class A), 17–A M.R.S. § 253(1)(B) (2011); 17–A M.R.S.A. § 253(1)(B) (Supp.2003),[1] and two counts of unlawful sexual contact (Class C), 17–A M.R.S. § 255–A(1)(E) (2011); 17–A M.R.S.A. § 255(1)(C) (Supp.2002),[2] entered in the Superior Court (Penobscot County, *Anderson, J.*). Bailey argues that the court erred in denying his motion to suppress live-witness testimony because the testimony should have been suppressed as "fruit of the poisonous tree" in violation of the Fourth Amendment of the United States Constitution and article I, section 5 of the Maine Constitution. The State contends that the court erred in granting Bailey's motion to suppress evidence discovered during a police search of Bailey's residence. Finding no error, we affirm the judgment.

---

1. Title 17–A M.R.S.A. § 253(1)(B) has since been amended. P.L.2003, ch. 711, § B–2 (effective July 30, 2004) (codified at 17–A M.R.S. § 253(1)(B) (2011)). Five of the charges for gross sexual assault are for acts that occurred prior to the effective date of the 2003 amendment.

2. Title 17–A M.R.S.A. § 255(1)(C) was repealed by P.L.2001, ch. 383, § 22, and replaced by P.L.2001, ch. 383, § 23 (effective Jan. 31, 2003), and R.R.2001, ch. 1, § 51, correcting P.L.2001, ch. 383, § 23, explanation (codified at 17–A M.R.S. § 255–A(1)(E) (2011)). One of the charges for unlawful sexual contact is for an act that occurred prior to the effective date of P.L.2001, ch. 383, § 22.

## I. BACKGROUND

[¶ 2] On November 26, 2008, the Superior Court denied Bailey's motion to suppress with respect to Detective Brent Beaulieu's search of Bailey's home computer. In *State v. Bailey*, 2010 ME 15, ¶ 30, 989 A.2d 716 (*Bailey I* ), we vacated the court's judgment and remanded the case back to the court for a hearing to determine whether the physical evidence gathered from Bailey's home immediately after the computer search and the testimony of the witnesses identified from that evidence should be suppressed. On remand, the court granted Bailey's motion to suppress with respect to the physical evidence seized from Bailey's home after the illegal computer search, but denied his motion to suppress with respect to the testimony of the witnesses identified as a result of the search. Bailey then entered into a conditional guilty plea on all twelve counts and was sentenced to twenty years imprisonment, with all but eight years suspended, and six years of probation. Bailey is also required to comply with the Sex Offender Registration and Notification Act, 34–A M.R.S. §§ 11201–11256 (2011), as a lifetime registrant.

[¶ 3] We view the record in a light most favorable to support the court's order on the motion to suppress, and find that the record supports the following facts. *See Bailey I*, 2010 ME 15, ¶ 3, 989 A.2d 716. The initial illegal computer search was conducted after Detective Beaulieu investigated a residence in Bangor for child pornography shared on the Internet. After determining that the residence's computer did not access or share any child pornography, Detective Beaulieu began to canvass the neighborhood in an attempt to determine whether a neighbor was accessing the residence's unsecured wireless router. During the canvass, Detective Beaulieu obtained permission to enter Bailey's apartment, conducted a search of Bailey's computer, and discovered thumbnails depicting videos of child pornography. In *Bailey I* we concluded that this search of Bailey's home computer exceeded the scope of Bailey's consent. 2010 ME 15, ¶¶ 27–28, 989 A.2d 716.

[¶ 4] After discovering the videos on Bailey's computer, Detective Beaulieu spoke with Bailey for a few minutes about the situation,[3] and then called another detective and requested that she deliver a written consent form to Bailey's apartment. Before receiving the written consent form, but after obtaining Bailey's verbal consent, Detective Beaulieu began to search the apartment. When the officer arrived with the written consent form Detective Beaulieu reviewed its contents with Bailey. Bailey then signed the written consent form, which informed him that he could refuse to give consent and require the police officers to obtain a warrant, that he could consult with someone else before giving consent, and that anything found during the search was subject to seizure.

[¶ 5] Bailey was unrestrained and free to move around the apartment during the entirety of the search. In conducting the search, and after Bailey signed the written consent form, Detective Beaulieu discovered seven eight-millimeter videotapes in Bailey's bureau. Detective Beaulieu asked Bailey if he could take the videotapes, and Bailey responded affirmatively.

[¶ 6] Detective Beaulieu reviewed the videotapes several days after obtaining them. Most of the videotapes displayed a scene indicating that what was previously recorded on the videotapes had been taped over. However, one videotape "depicted

---

3. In its order, the court explains that the State agrees that Bailey's statements made "contemporaneously with the computer search[ ] should be suppressed."

sexual displays and inappropriate activity involving two young girls." Detective Beaulieu cropped headshots of the two girls in the videotape and showed the headshots to Bailey's daughter. His daughter immediately recognized and identified the two victims.

[¶ 7] Detective Beaulieu obtained permission from the first victim's mother to speak with her about possible abuse and proceeded to speak with her for about forty minutes. Detective Beaulieu asked her if she knew Bailey's daughter, and she answered that she had spent the night at Bailey's house in the past. Detective Beaulieu asked her if there was anything that happened at the Bailey residence that she would consider inappropriate; she answered the question affirmatively, and told Detective Beaulieu about some "acts" that the second victim had disclosed to her. Detective Beaulieu "did not indicate anything about the videotape," but showed the first victim the headshot, and she confirmed that the picture was of her.

[¶ 8] Detective Beaulieu next contacted the second victim and interviewed her for about forty minutes as well. She confirmed that she also frequently spent the night at the Bailey household. When told that Detective Beaulieu was investigating "improper conduct" at Bailey's house, she was visibly shaken and began to cry. She told Detective Beaulieu "that Mr. Bailey had engaged in various forms of sexual activity with her and had done similar things to [the first victim]." Detective Beaulieu interviewed the first victim again based on the information he received from the second victim, and the first victim confirmed that Bailey had also engaged in sexual activity with her.

[¶ 9] The videotape is date-stamped July 27, 2004. Both victims were under the age of fourteen at the time of the alleged acts.

[¶ 10] At the second suppression hearing, both girls testified that no one forced them to testify, and that they were not coerced into answering Detective Beaulieu's questions when he interviewed them. Neither girl reported the incidents before Detective Beaulieu spoke with them, and the second victim testified that she might not have come forward if Detective Beaulieu had not contacted her, but stated that he helped give her the courage to come forward and talk about the incidents. The only pressure Detective Beaulieu applied was telling the girls that it was important to cooperate, but he also told both girls that they did not have to testify if they did not want to.

[¶ 11] After holding the hearing on the motion, the court issued an order granting the motion to suppress the videotape and denying the motion to suppress the testimony of the two victims. Specifically, the court applied the factors identified in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and concluded that "Bailey's consent to search his apartment was not voluntary," and that "his consent manifested a submission to authority created by the prior illegality." However, after applying the factors relevant to live-witness testimony identified in *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), the court concluded that the two girls should be allowed to testify because live-witness testimony is different from physical evidence. Bailey appeals the court's judgment pursuant to 15 M.R.S. § 2115 (2011) and M.R.App. P. 2.

## II.  DISCUSSION

[¶ 12] In reviewing a court's order on a motion to suppress, we "review the factual findings of the motion court to determine whether those findings are sup-

ported by the record, and will only set aside those findings if they are clearly erroneous." *Bailey I*, 2010 ME 15, ¶ 16, 989 A.2d 716 (quotation marks omitted). However, "a challenge to the application of those facts to constitutional protections is a matter of law that we review de novo." *Id.* (quotation marks omitted). If the ruling on the motion to suppress is based primarily on undisputed facts, it "is viewed as a legal conclusion that is reviewed de novo." *Id.*

[¶ 13] Bailey argues that the court properly evaluated the *Brown* factors to hold that his consent to the search of his apartment was not voluntary. Bailey further argues that the witnesses' testimony should be suppressed because the witnesses would not have been identified if it were not for the illegal search of his apartment and seizure of the videotape. The State argues that the court erred in suppressing the videotape because Bailey voluntarily consented to the search of his apartment. The State also argues that even if the videotape was properly suppressed, the court correctly ruled that the witnesses' testimony was admissible because the *Ceccolini* factors weigh in favor of its admission.

[¶ 14] Because the Supreme Court has created different tests to determine the admissibility of physical evidence and the admissibility of live-witness testimony, *compare Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254 (establishing the test for the admissibility of statements made after an illegal arrest), and *State v. LeGassey*, 456 A.2d 366, 368 (Me.1983) (holding that *Brown* applies to both the admissibility of statements made after an illegal arrest and the admissibility of physical evidence obtained after police illegality), *with Ceccolini*, 435 U.S. at 276–80, 98 S.Ct. 1054 (establishing the test for the admissibility of live-witness testimony), we will evaluate the admissibility of the videotape and of the testimony of the two victims separately.

A.  Admissibility of the Videotape

■  [¶ 15]  The Supreme Court's decision in *Brown* governs the admissibility of the videotape in the present case. In *Brown*, the Court considered whether statements made by Brown after an illegal arrest "were to be excluded as the fruit of the illegal arrest, or were admissible because the giving of the *Miranda* warnings sufficiently attenuated the taint of the arrest." 422 U.S. at 591–92, 95 S.Ct. 2254. The Court identified four factors to utilize when evaluating whether evidence that was obtained after an illegal arrest is admissible. *Id.* at 603–04, 95 S.Ct. 2254. As a threshold requirement, the statement must be voluntary. *Id.* at 604, 95 S.Ct. 2254. The remaining three factors are described as "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. 2254 (citation omitted). Additionally, it is important to consider whether *Miranda* warnings were given before the statement was made. *Id.* at 603, 95 S.Ct. 2254. Although *Brown* specifically addressed the admissibility of statements made after an illegal arrest, we have applied the factors to physical evidence as well. *See State v. Boyington*, 1998 ME 163, ¶¶ 10–11, 714 A.2d 141; *cf. State v. LeGassey*, 456 A.2d at 368 (applying the *Brown* factors to the defendant's confession and to the results of a breath test).

■  [¶ 16]  The purpose of the *Brown* test is to deter "lawless conduct by … officers, and [to] clos[e] the doors of the … courts to any use of evidence unconstitutionally obtained." 422 U.S. at 599, 95 S.Ct. 2254 (quotation marks omitted).

However, the Brown Court emphasized that, "despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *Id.* at 600, 95 S.Ct. 2254 (alteration omitted) (quotation marks omitted). In *LeGassey,* we noted that the *Brown* factors serve as a means to determine whether, in light of the initial police illegality, the subsequent evidence was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *LeGassey,* 456 A.2d at 368 (quotation marks omitted). We have held that consent may purge the taint of a constitutional violation. *State v. Trusiani,* 2004 ME 107, ¶ 20, 854 A.2d 860. The State bears the burden of proving, by a preponderance of the evidence, "that an objective manifestation of consent was given by word or gesture." *State v. Seamen's Club,* 1997 ME 70, ¶ 7, 691 A.2d 1248.

[¶ 17] Here, the court did not directly address temporal proximity, intervening circumstances, or the purpose and flagrancy of the misconduct, finding in the threshold inquiry that Bailey's consent to the search of his apartment was not voluntary. The court concluded that Bailey's consent "manifested a submission to authority created by the prior illegality."

[¶ 18] Consent is not voluntary "if the consent was induced by deceit, trickery or misrepresentation of the officials making the search," *State v. Barlow,* 320 A.2d 895, 900 (Me.1974), or if the defendant is essentially given no choice due to the initial police conduct, *see United States v. Collins,* 510 F.3d 697, 701 (7th Cir.2007). In *Collins,* the police illegally entered an apartment using a battering ram, and then, once one of the defendants was handcuffed, asked for his consent to search the apartment. 510 F.3d. at 698, 701. The

court concluded that the defendant "consented to the choice at a time when he had no real choice, and he had no real choice because of police misconduct." *Id.* at 701.

[¶ 19] The facts as found by the court support the conclusion that the consent was not voluntary. Bailey consented to the search of his apartment just minutes after Detective Beaulieu illegally discovered child pornography on Bailey's personal computer. Thus, the court's conclusion that "the damage ha[d] been done" and the consent was merely a resignation to police authority, not a voluntary act, is supported by the record.

**B. Admissibility of the Live–Witness Testimony**

[¶ 20] In *Ceccolini* the Supreme Court addressed the factors that dictate whether the exclusionary rule should apply to live-witness testimony. The factors are (1) the amount of free will exercised by the witness; (2) whether the initial illegality that led to the discovery of the witness was used to compel the witness to testify, or if the witness testifies as a product of "detached reflection and a desire to be cooperative"; (3) whether the testimony is related to the purpose of the original illegal search, keeping in mind that the exclusion would forever prevent the witness from testifying; (4) the amount of time that elapsed between the initial illegality and the initial contact with the witness, and between the initial contact with the witness and the testimony at trial; (5) whether the witness was known to the police officers prior to the illegal conduct; and (6) whether applying the exclusionary rule would have a future deterrent effect on police conduct. *Ceccolini,* 435 U.S. at 276–80, 98 S.Ct. 1054.

[¶ 21] Although the Court in *Ceccolini* declined to adopt a per se rule that live-witness testimony should never be exclud-

ed, it acknowledged that witness testimony must be evaluated differently from physical evidence. *Id.* at 274–76, 98 S.Ct. 1054 ("Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet."). The Court instructed that the decision "cannot be decided on the basis of causation in the logical sense alone." *Id.* at 274, 98 S.Ct. 1054. Instead, the Court indicated that a closer link between the illegality and the witness's testimony is required to exclude the testimony than with nontestimonial evidence because "the cost of excluding live-witness testimony often will be greater." *Id.* at 278, 98 S.Ct. 1054.

[¶ 22] In a case factually similar to this one, the police received information about the sexual abuse of minors at a school. *United States v. Wipf,* 397 F.3d 677, 680 (8th Cir.2005). The police obtained a search warrant and seized videotapes, among other evidence, from Wipf's home and used the videotapes to identify a previously unknown victim. *Id.* at 681. The victim's parents and a psychologist persuaded him to talk about the past abuse, partially by revealing the existence of the videotapes. *Id.* at 681, 684. The trial court granted Wipf's motion to suppress the evidence seized from his house, but allowed the victim to testify. *Id.* at 681–83. The Eighth Circuit Court of Appeals upheld the admission of the victim's testimony after applying the *Ceccolini* factors, specifically finding that the victim testified willingly; the illegally-seized videotapes were used indirectly to convince the victim to talk; the police never confronted the victim with the existence of the videotapes; the videotapes were never shown to the victim; about nine days elapsed between the illegal search and the first contact with the victim, and nine months elapsed before the victim testified at trial; and the purpose of the search was not to identify additional victims, but rather to corroborate the information originally received. *Id.* at 684–85.

[¶ 23] As the trial court found, application of the *Ceccolini* factors to this case weigh in favor of admitting the live-witness testimony. In its decision, the court found that the witnesses testified of their own free will, that there was a possibility that the witnesses could come forward in the future, and that the purpose of Detective Beaulieu's search was not to identify the then unknown victims. These findings support the court's decision to deny the motion to suppress the live-witness testimony. Additionally, the facts that the testimony was not directly related to the purpose of the original search, that the victims testified in court over two years after they were first identified, and that the victims would otherwise be forever prevented from testifying against Bailey also weigh in favor of admitting the testimony.

[¶ 24] In conclusion, the Superior Court properly considered the factors set out in *Brown* in determining the admissibility of the videotape, and properly considered the factors set out in *Ceccolini* in determining the admissibility of the witnesses' testimony.

The entry is:

Judgment affirmed.

SILVER, J., with whom LEVY J., joins, concurring in part and dissenting in part.

[¶ 25] The search of the computer was illegal; the search of the house was illegal; and the seizure of the videotape was illegal. The Court is drawing an imaginary line between the seizure of the videotape and the identities of the two witnesses. Their identities came directly from the videotape. We should not allow the prod-

uct of an illegal search to be admitted in evidence when it is so closely connected to the purpose of the search and when the same live witnesses could have come from truly independent, or at least constitutional, methods. The videotape was properly suppressed and I would have suppressed the testimony as well.

[¶ 26] The Fourth Amendment to the United States Constitution and article 1, section 5 of the Maine Constitution require that citizens be secure in their homes and effects. These Constitutional provisions require that, except in limited circumstances that do not apply here, police officers who wish to search a home must first obtain a warrant by convincing an impartial magistrate that they have probable cause to believe they will find evidence of criminal wrongdoing during the search. *See* U.S. Const. amend. IV; Me. Const. art. I, § 5. This requirement applies no matter how abhorrent the suspected behavior. As a remedy for the failure of police to comply with the warrant requirement, evidence obtained from an unlawful search or seizure in violation of the Fourth Amendment may be excluded from admission in evidence at trial. *See State v. Nadeau,* 2010 ME 71, ¶ 37, 1 A.3d 445. Here, suppressing the videotape discovered during the illegal search but admitting evidence obtained from the videotape does not rectify the violation of Bailey's constitutional rights caused by the illegal search.

[¶ 27] One of the *Ceccolini* factors, and the one I consider the most important, is whether excluding the testimony would have a significant deterrent effect on police misconduct. *See United States v. Ceccolini,* 435 U.S. 268, 280, 98 S.Ct. 1054, 55

L.Ed.2d 268 (1978). The police misconduct here was flagrant enough to warrant vacating Bailey's conviction the first time this case was before the Court. *State v. Bailey,* 2010 ME 15, ¶ 29, 989 A.2d 716. We held that the detective's search of Bailey's computer and the subsequent search of his home exceeded the scope of his consent and violated the Fourth Amendment. *Id.* ¶ 28. Although the detective was actually investigating child pornography, he entered Bailey's home under the pretense of investigating "a problem in the neighborhood with people gaining access to someone else's computer." *Id.* ¶¶ 4–7. Our holding recognized that Bailey allowed the detective to look at his computer only because he believed the detective was trying to determine whether someone else was gaining unauthorized access to it. *Id.* ¶ 28. The detective violated Bailey's constitutional rights by searching the computer for child pornography, questioning Bailey, and searching his home. *Id.* ¶¶ 9–10, 28. That illegal search led to the discovery of the videotapes that the Court agrees must be suppressed. *Id.* ¶ 10.

[¶ 28] The detective should have obtained a warrant, at the latest, once the search of the computer showed that it contained child pornography.[4] If the detective had done so the live testimony would not be an issue. Proper police procedure would have enabled the State to use the physical evidence to successfully prosecute Bailey without violating his Fourth Amendment rights. The Court acknowledges that the videotapes were obtained unconstitutionally, but authorizes the State's use of the videotape to obtain crucial testimony from the victims identified in the videotape and to use that testi-

---

4. At oral argument the State agreed that the detective should have stopped the search and obtained a warrant as soon as he saw the LimeWire icon indicating that Bailey had access to the peer-to-peer networking program

through which child pornography was being shared, *see State v. Bailey,* 2010 ME 15, ¶¶ 4, 8, 989 A.2d 716, and that "nothing would have stopped him from getting a warrant at that point."

mony against Bailey. By declaring the testimony to be constitutional the Court is effectively approving the illegal seizure of the videotape. This Court should not reward illegal searches and seizures by relying on an illusory distinction between the videotape and what surfaced from the videotape. This is a mythical distinction and a clear violation of the Fourth Amendment.

[¶ 29] Part of the rationale for the result in *Ceccolini* was that witnesses might come forward on their own, notwithstanding an illegal search. *See Ceccolini,* 435 U.S. at 275–79, 98 S.Ct. 1054. The detective here also undermined that key justification for admitting live-witness testimony even when physical evidence has been suppressed. The detective actively sought out the witnesses in the same way he illegally sought out physical evidence. He discovered the videotape in the course of an illegal search. He used the videotape to identify, find, and question the victims about the crime. The court found that he did this a few days after he obtained the videotape. No other lead brought the victims forward. The victims did not come forward on their own. One of the victims testified that the detective and the State "helped [her] to have th[e] courage to come forward." We will never know if these young victims would have come forward at some later point to reveal Bailey's behavior. If they had come forward at any time in the future, Bailey would be subject to prosecution because there is no statute of limitations regarding the sexual assault of children. *See* 17–A M.R.S. § 8(1) (2011).

[¶ 30] An analysis of the other *Ceccolini* factors indicates that the search and testimony are not attenuated enough to justify admitting the testimony here. In *Ceccolini* a police officer happened to find evidence of illegal betting while innocently talking to his friend in a flower shop. *Ceccolini,* 435 U.S. at 269–70, 98 S.Ct. 1054. The officer told detectives in his precinct, and the detectives in turn informed an FBI agent because the FBI had previously suspected that the shop was involved in illegal gambling. *Id.* at 270–71, 98 S.Ct. 1054. The FBI agent "was not fully informed of the manner in which [the police officer] had obtained the information," so when he questioned a shop employee four months later he did not mention the evidence or the police officer who found it. *Id.* at 272, 98 S.Ct. 1054. The United States Supreme Court held that the employee's testimony should not have been suppressed in the shop owner's trial for perjury because it was sufficiently unrelated to the illegal search. *Id.* at 279–80, 98 S.Ct. 1054.

[¶ 31] The situation here is very different from *Ceccolini.* The detective went to Bailey's home with the specific purpose of investigating child pornography. He obtained videotapes illegally by searching Bailey's home without a warrant. He did not know the identity of the victims before the search. He identified the victims by making headshots from the videotape. He showed the headshot of each victim to Bailey's daughter who identified each girl as a friend. Only then did the detective locate each victim. He referenced the headshots during his interviews with the victims. Each victim eventually disclosed that Bailey had sexually assaulted her, which led Bailey to be charged with thirteen counts of Class A, B, and C crimes. The same detective conducted the illegal search, found the videotapes, cropped the headshots, interviewed Bailey's daughter to get the victims' names, and then interviewed the victims. The events here—and the closeness of the connection between the illegal search and the live-witness testimony—are much different from *Ceccolini* and support a different result.

[¶ 32] Taken together, the *Ceccolini* factors weigh in favor of exclusion. I would not use them to excuse a clear violation of the Fourth Amendment involving a warrantless, nonconsensual search of a person's home as harmless police behavior. I therefore dissent on this issue.