2012 ME 96

STATE of Maine

v.

Rachel C. PRESCOTT.

Supreme Judicial Court of Maine.

Argued: May 8, 2012.

Decided: July 17, 2012.

Ariel R. Gamble, Esq. (orally), Basham & Scott, LLC, Brunswick, for appellant Rachel C. Prescott.

Geoffrey A. Rushlau, District Attorney, and Deborah P. Cashman, Asst. Dist. Atty. (orally), Office of the District Attorney, Bath, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

MEAD, J.

[¶ 1] Rachel C. Prescott appeals from a judgment of conviction entered by the Superior Court (Sagadahoc County, *Field, J.*) following her conditional guilty plea to a complaint charging her with operating under the influence (Class D), 29–A M.R.S. § 2411(1–A)(B)(1) (2011), and failure to report an accident (Class E), 29–A M.R.S. § 2251(8)(A) (2011). Prescott's plea preserved her right to appeal from an order of the court (*Horton, J.*) denying her motion to suppress evidence derived from police questioning. Because we conclude that Prescott was in police custody during part of her questioning, we vacate the judgment and vacate the suppression order in part.

## I. BACKGROUND

[¶ 2] We view the facts in the light most favorable to the court's order on the motion to suppress. *State v. Bailey,* 2012 ME 55, ¶ 3, 41 A.3d 535. On *Bailey,* 2012 ME 55, ¶ 3, 41 A.3d 535. On February 12, 2011, at about 10:30 p.m., Sergeant Mark Gilliam and Officer Peter Kaminski of the Topsham Police Department were dispatched to the scene of a single car accident. Both officers were in uniform and driving marked police cruisers. The weather that night was cold and overcast, but there was no precipitation falling. They found an unattended vehicle that had crossed a median, slid across the road, and ended up partially in a snow bank. The officers determined that the vehicle had sustained more than $1000 in damage, which is the statutory threshold for an accident that must be reported. *See* 29–A M.R.S. § 2251(1)-(2) (2011).

[¶ 3] Sergeant Gilliam determined that Rachel Prescott was the owner of the vehicle after running a database check on the license plate number; the inquiry produced a residence address for Prescott approximately one mile away. In an effort to locate the operator of the vehicle so that

the accident could be investigated, Gilliam went to Prescott's address in his patrol car without employing his lights or siren. He knocked on the door, which Prescott's father opened. Prescott came downstairs to the door and spoke to Gilliam, telling him in response to his question that she had been the operator of the car involved in the accident. Gilliam's demeanor was businesslike, and not threatening or intimidating. He did not read Prescott *Miranda* warnings.

[¶ 4] The motion court found that

Sgt. Gilliam then told [Prescott] he needed her to come with him to the accident scene to enable the accident to be investigated. Sgt. Gilliam's statement that Ms. Prescott needed to go back with him to the scene of the accident would have made it clear to a reasonable person in the Defendant's position that she had no choice but to go.

. . . .

Although there is no evidence that she made any specific objection to Sgt. Gilliam's statement that she needed to go back to the scene with him, clearly she did not go back on her own initiative or entirely voluntarily.

[¶ 5] Gilliam drove Prescott the one mile back to the scene, arriving some ten minutes after he had originally left. He did not employ his cruiser's lights or siren, and Prescott was not handcuffed or restrained. Gilliam did not ask her any questions during the ride, nor did Prescott make any statements. Once Prescott arrived at the accident scene, Officer Kaminski resumed his role as the primary investigator. The blue lights on Kaminski's cruiser were turned on to alert traffic.

[¶ 6] Kaminski first asked Prescott if she was injured; she said that she just wanted to get home. Prescott attributed the accident to brake failure, an explanation Kaminski questioned because it seemed an unlikely cause for an accident occurring while going uphill. Kaminski suspected that excessive speed was a likely factor. While speaking to Prescott, Kaminski smelled the odor of alcohol on her breath and asked her if she had been drinking; Prescott answered that she had a couple of drinks at a friend's house before the accident. In response to a follow-up question she said that she had not had anything to drink since that time. When Prescott became upset over the fact that the person who picked her up after the accident had called the police, Kaminski told her that she could be charged with leaving the scene and that she had "other worries," explaining that he "was trying to get her to focus on the crash and not the person that gave her the ride." The court found that his tone while questioning Prescott was "businesslike and relatively low-key."

[¶ 7] Kaminski decided to administer field sobriety tests; Prescott again asked if she could go home. Kaminski did not tell Prescott that she could leave at any time during his contact with her. During the first field sobriety test, Prescott began to sob, and during the second field sobriety test she became so upset that Kaminski stopped the test. Based on what he had observed, Kaminski arrested her for operating under the influence, took her to the station, and administered an intoxilyzer test. The court found that the time between Prescott's return to the accident scene and her arrest was no more than thirty minutes. It further found that Prescott had not been given *Miranda* warnings prior to her arrest.

[¶ 8] Prescott was charged by complaint with operating under the influence (OUI) and failure to report an accident. The case was transferred to the Superior Court for a jury trial. Prescott filed a motion to suppress all statements that she

made to Gilliam or Kaminski on the ground that they were the product of custodial interrogation without the administration of *Miranda* warnings. The motion was heard and subsequently denied by written order (*Horton, J.*). On August 24, 2011, Prescott entered a conditional guilty plea pursuant to M.R.Crim. P. 11(a)(2), preserving her right to appeal from the denial of her motion to suppress. The court (*Field, J.*) sentenced her on the operating under the influence count to ninety days' imprisonment, with all but seven days suspended, and one year of probation; a $700 fine; and a three-year license suspension. On the failure to report an accident count, the court sentenced her to forty-eight hours concurrent. This appeal followed.

## II. DISCUSSION

[¶ 9] "Statements made during a custodial interrogation are admissible only if the person making the statements has been advised of the rights referred to in *Miranda v. Arizona.*" *State v. Williams,* 2011 ME 36, ¶ 7, 15 A.3d 753 (quotation marks omitted). The sole issue presented by this appeal is whether Rachel Prescott was in custody for Fifth Amendment purposes [1] when she answered Sergeant Gilliam's questions at her home, and Officer Kaminski's questions at the accident scene, without first being read *Miranda* warnings. *See State v. Dominique,* 2008 ME 180, ¶ 16, 960 A.2d 1160 ("The development of the Miranda warnings stems from the Fifth Amendment privilege against compelled self-incrimination."). Prescott asserts that she was in police custody, and so the court erred in denying her motion to suppress her statements. The State argues that Prescott was not in custody, but rather was subjected to a brief investigato-

ry detention, commonly known as a *Terry* stop. *See State v. Donatelli,* 2010 ME 43, ¶ 12, 995 A.2d 238 (discussing the standards for a *Terry* stop).

A. Burden, Standard of Review, and Applicable Test

[¶ 10] At the motion hearing, the State had the burden to prove that Prescott was not in custody by a preponderance of the evidence. *See State v. Poblete,* 2010 ME 37, ¶ 21, 993 A.2d 1104. Whether Prescott was in custody when she was questioned is a mixed question of fact and law, and so we defer to the motion court's factual findings, but review its custody determination de novo. *Williams,* 2011 ME 36, ¶ 6, 15 A.3d 753. Our "ultimate inquiry is whether a reasonable person standing in the shoes of [Prescott] would have felt he or she was not at liberty to terminate the interrogation and leave or if there was a restraint on freedom of movement of the degree associated with a formal arrest." *Poblete,* 2010 ME 37, ¶ 22, 993 A.2d 1104 (quotation marks omitted).

[¶ 11] The test is an objective one, taking into consideration a number of factors in their totality, not in isolation. *State v. Dion,* 2007 ME 87, ¶ 23, 928 A.2d 746. Because the custody test is purely objective, "[t]he subjective intent or beliefs of either the police or the suspect play no role in the legal determination except to the extent that they manifest themselves outwardly and would affect whether a reasonable person would feel constrained to a degree commensurate with police custody." *State v. Holloway,* 2000 ME 172, ¶ 15, 760 A.2d 223. Among the factors that may be considered in determining

1. The Fifth Amendment to the United States Constitution provides: "No person ... shall be compelled in any criminal case to be a witness against himself...."

whether a person is in custody for Fifth Amendment purposes are:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*Dion,* 2007 ME 87, ¶ 23, 928 A.2d 746.

### B. Questioning at Prescott's Residence

■ [¶ 12] At Prescott's home, Sergeant Gilliam asked her if she was the operator of the vehicle involved in the accident, and she answered that she was. The motion court found that Prescott "was not in custody at any time while being questioned by police. This is more clearly the case with regard to the questioning inside the Defendant's own home. . . ." Applying the factors identified above, the court's finding that Prescott was not in custody when Gilliam questioned her is not erroneous. Although Gilliam initiated the contact and Prescott was obviously the focus of his inquiry, she was questioned briefly and calmly in her own home; Gilliam, the only officer present, said nothing about Prescott having to leave the home at that point; Prescott's father was present; and no physical restraint was used. A reasonable person would not feel compelled to continue contact with the police and answer questions under those circumstances.

### C. Questioning at the Accident Scene

■ [¶ 13] Following his brief contact with Prescott at her home, and after directing her to accompany him, Gilliam transported her back to the accident scene where Officer Kaminski (1) confirmed that she had been the driver of the car involved in the accident, (2) learned that she had been drinking earlier, and (3) verified that she had not been drinking since the accident. The motion court found that Kaminski's questioning was also noncustodial. Here the court erred because this was not, as the State urges, a simple *Terry* stop involving a brief, limited intrusion into Prescott's liberty, as likely would have been the case had Prescott been with her car when police arrived and the same sequence of events had then taken place. *See Donatelli,* 2010 ME 43, ¶ 17, 995 A.2d 238 (characterizing a *Terry* stop as a "limited intrusion"); *State v. Gulick,* 2000 ME 170, ¶ 10 n. 4, 759 A.2d 1085 ("A brief restriction on a citizen's right to walk (or drive) away is usually referred to as a detention or a stop in order to distinguish the more limited restriction from a restriction commensurate with arrest.").

[¶ 14] Contrary to the court's conclusion that "the position [Prescott] found herself in was very similar to that of a motorist who is stopped by police along a

road and [is] not free to leave the scene," the two events cannot be equated. In one scenario, a law enforcement officer simply directs a person to remain at an accident scene while he or she investigates. In the scenario presented here, the law enforcement officer advises a person who is in another place, away from the scene, "you need to come with me"; takes the person from that place involuntarily, however politely; puts the person in a police car; and transports the person to the scene for questioning.[2] That is what the motion court found occurred in this case, and that sequence of events describes "a restraint on freedom of movement of the degree associated with a formal arrest." *Dion*, 2007 ME 87, ¶ 23, 928 A.2d 746 (quotation marks omitted).

[¶ 15] Having been involuntarily transported to the accident scene at the direction of the police officer, no reasonable person standing in Prescott's shoes would have felt she could then leave. Her requests to return home were not acknowledged and the interrogation continued unabated. Accordingly, contrary to the State's assertion, Prescott was subjected to custody, not an investigatory detention, and absent a waiver of her *Miranda* rights, her answers to Kaminski's questions were not admissible at trial. *See Poblete*, 2010 ME 37, ¶ 22, 993 A.2d 1104; *Dominique*, 2008 ME 180, ¶ 16, 960 A.2d 1160 ("*Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices...." (quotation marks omitted)).

[¶ 16] Consideration of the factors we have identified as relevant to a custody determination confirms our conclusion that Prescott was in custody when Kaminski questioned her. Discussed in the order listed above, *see Dion*, 2007 ME 87, ¶ 23, 928 A.2d 746: (1) Kaminski's questioning took place in the dark and cold, at the scene of an accident involving significant damage to Prescott's car, and in the vicinity of a police cruiser with its lights flashing; (2) questioning was not only initiated by police, but was effectively compelled by them in that Prescott was removed from her home with no warning that she could decline to answer their questions; (3) Kaminski openly questioned Prescott's explanation of how the accident occurred, and told her that she could be charged with leaving the scene of the accident; (4) Gilliam told Prescott that she needed to return to the scene with him; (5) Prescott told the officers that she wanted to return home with no evident effect, and Kaminski testified that he never told her that she could leave; (6) the focus of the accident investigation, and the subsequent OUI investigation, was clearly and solely on Prescott; (7) the surroundings, a public street a mile from Prescott's home, may well have been familiar to her; (8) two officers were present, but only Kaminski questioned her at the scene while Gilliam did traffic control; (9) no physical restraint was used; and (10) the questioning and the accident and OUI investigations combined lasted about thirty minutes at the scene, and the officers were professional and non-threatening.

[¶ 17] Some of these factors weigh in favor of Prescott's argument, and some in favor of the State's position. Viewed in their totality, however, these factors lead to a conclusion that the circumstances "exert[ed] upon [Prescott] pressures that suf-

---

**2.** When Gilliam spoke to Prescott in her home, he was investigating an unreported traffic accident. Once she admitted to being the operator of the vehicle involved, the re- quired accident report could have been completed without compelling Prescott to return to the scene.

ficiently impair[ed] [her] free exercise of [her] privilege against self-incrimination to require that [she] be warned of [her] constitutional rights." *State v. Lavoie*, 562 A.2d 146, 148 (Me.1989) (quotation marks omitted). We therefore vacate the judgment of conviction and vacate the suppression order insofar as it denied Prescott's motion to suppress the statements she made to Kaminski at the accident scene.

The entry is:

Judgment of conviction vacated. Suppression order vacated in part; remanded for entry of an order and further proceedings consistent with this opinion.