STATE OF MAINE                    UNIFIED CRIMINAL COURT
KENNEBEC, SS.                     AUGUSTA
                                 DOCKET NO. CR-2019-2041


STATE OF MAINE

V.                               **ORDER ON MOTION TO SUPPRESS**

JEFFREY TYLER


## INTRODUCTION

This matter is before the court on the Defendant (Jeffrey Tyler's) Motion to Suppress statements he made to Detective Ryan Brockway of the Maine State Police on January 23, 2019. The basis for the motion to suppress, dated August 25, 2019, is the contention that Tyler was subjected to custodial interrogation without receiving *Miranda* warnings. The State maintains that Tyler was never in custody for Fifth Amendment purposes and, therefore, *Miranda* warnings were not required.

An evidentiary hearing was held on October 7, 2020, at which the court received the testimony of Det. Brockway. State's Exhibit 1, a CD recording of Brockway's interview with Tyler, was admitted into evidence without objection.[1]

Based on the evidence presented at the hearing, and after consideration of the oral arguments of counsel for the parties, the court makes the following findings of fact.

---

[1] Defense Counsel also provided the court with a transcript of the CD recording that had been prepared by his office. The court received this transcription as an aid in listening to the recording, with the understanding that the only evidence of the interview is the recording itself.

# FINDINGS OF FACT

On September 20, 2019, Tyler was charged by complaint with one count of Gross Sexual Assault (Class A) and one count of Sexual Abuse of a Minor (Class C), alleged to have been committed against M.C. He was later indicted on December 19, 2019 for the same charges and an additional count of Gross Sexual Assault (Class C).

Detective Brockway of the Maine State Police had been investigating allegations of sexual wrongdoing by Tyler involving M.C. well prior to the formal charges having been brought. On January 23, 2019, Brockway went to Tyler's workplace in an effort to meet with him and talk. Tyler was not present at that time, but one of his co-workers contacted him and arranged for Brockway to speak with Tyler over the phone. Tyler agreed to meet with Brockway at the parking lot of Home Depot in Augusta.

Tyler arrived at the parking lot in his own vehicle. Brockway asked if they could talk in his unmarked police cruiser and Tyler agreed. Before allowing Tyler to enter the cruiser Brockway, following standard police protocol, did a pat-down of him for weapons. Shortly after Tyler got into the cruiser, Brockway started recording the conversation.

At approximately 2:10 of the recording, Brockway asked Tyler if he had "any idea why I want to meet up with you and chat with you today?" Tyler said: "Mmmm . . . vaguely I guess." When Brockway asked him what that might be, Tyler said: "Probably my affair that I had on my wife." Brockway asked him to be more specific, and Tyler explained that he'd had a recent affair with "M.C" within the "past year." Brockway then asked: "So you think that this conversation is about that?" Tyler replied: "I have no idea. I am assuming that must be what it is." Brockway confirmed that Tyler was correct in his assumption.

At that point in the interview (3:04 of the recording), Brockway said he wanted to lay out the ground rules for the interview. He emphasized that he wanted Tyler to understand and "hear me." The following colloquy then took place:

> BROCKWAY: Some of the ground rules, no matter what you say to me today, no matter what, you are getting back in that vehicle and I am leaving to go back to what I got. I got 100 other things.
>
> TYLER: Uh-huh.
>
> BROCKWAY: No matter what.
>
> TYLER: Yup.
>
> BROCKWAY: You can't say anything that is going to alter that.
>
> TYLER: Yup.
>
> BROCKWAY: O.K. Well there is one thing. Om, but, we will get to that.[2] We will get to that. But, for the most part if your story is somewhat similar to the other story that I have, you are getting in your vehicle and you are leaving and I am leaving. Two different directions. O.K.? Om, you are not under arrest. You are sitting here in your own free will.
>
> TYLER: Uh-huh.
>
> BROCKWAY: Om, door is unlocked. You can try opening it, shutting it. You know. You are not under arrest.
>
> TYLER: Uh-huh.
>
> BROCKWAY: You are not gonna be under arrest.
>
> TYLER: O.K.

---

[2] At this point in the recording (3:57), Tyler can be heard making what the court would characterize as a nervous laugh.

> BROCKWAY: O.K. Those are some very important ground rules for you to have at the forefront of your mind as we proceed. O.K.? Om, I do hope that you are gonna be open and honest with me. Obviously, you can tell from the white hair on my head I have been doing this for a while. O.K.?

Brockway then assured Tyler that he was not there to judge him and that many people had sat in his cruiser, where Tyler was then sitting, who had made mistakes, including those who had killed other people and babies, as well as, "[p]eople that have had affairs with people that are not of age." He encouraged Tyler to "fess" up to the mistakes he had made and "move on."

Tyler told Brockway that he had known M.C. for 7 or 8 years when she would spend time with other kids who camped out with the Tyler family. He claimed that in the past year, when M.C. was 18, their relationship had taken a different turn and he had a sexual affair with her. He made statements about where he and M.C. would meet up to have sexual relations and the types of emails and messages they would send to each other. He told Brockway that the relationship lasted "maybe" 6 months and ended when his wife found out about it and it stopped. He denied having any contact with M.C. after he was "caught."

Brockway then directed the conversation to what vehicles Tyler owned or had owned in the past. When Tyler asked: "Why the questions about the truck?", Brockway said: "Well so far you are not being very honest with me. O.K.?" Brockway then began to describe some of the information he had compiled as part of his investigation and repeated: ". . . so I know for a fact that you are just not being very honest with me. You are being deceptive . . . ." At 22:40 of the recording, Brockway told Tyler:

> BROCKWAY: It is about having a relationship with her, a sexual relationship when she was a minor. That's what it's about, O.K.? So that pickup truck, the reason why it is kind of important is it does serve as a time stamp. Om, I have the title to it, showing the date that you

4

did get it. Om, that is a vehicle that you would go to the area of [her high school] and you would meet [M.C.] and that's kind of like where things started. Relationship-wise.

The conversation continued for a few minutes more with Brockway telling Tyler more details of his investigation and, specifically, that the relationship with M.C. started when she was 14 and that they shared nude photos of each other. Brockway told Tyler that he was trying to give him "a small flavor" of what his investigation had uncovered.

> BROCKWAY: . . . . It expands a lot more than that. Om, what I am looking for is for you to say yup, O.K. I got it. This is what we did. O.K. And I am looking for that to somewhat match to what I have for information and for what she says. O.K.? What I have for information definitely does match up with her story. I am looking for yours to match a lot more that what you have offered up in your first story. O.K.? Is that something you can do for me?
>
> TYLER: I think I want to go and think about this for a bit. And try and get my thoughts in order. Om, I am not real confident talking about any of this right now. Is that something that I can do?
>
> BROCKWAY: I can appreciate where you are coming from. O.K.? I really can. But I have to say more times than not you know, and I come from years of experience, more times than not it is best to just get it out right now, O.K.? If you end up leaving other things happen and we end up not meeting again.
>
> TYLER: What do you mean other things happen?
>
> BROCKWAY: You talk to different people or whether you just decide for yourself that you don't want to meet up again . . .
>
> TYLER: No. I have no problem talking with you again.
>
> BROCKWAY: This is just a perfect opportunity, we are both here, we both have this time to just hammer this out and let's move on. You

know, let's move forward. Om, I don't know what I can say Jeff, I mean I have been in this position many, many, many times.

TYLER: Yup.

BROCKWAY: O.K.? I totally understand how you are feeling, what you are thinking, uh, because I have had people later, after having this conversation tell me what it is they were thinking, what it is that they were feeling as they were trying to decide, you know, what to say. How to say it. O.K. We both can agree we cannot go back and change what has happened. That is a given. O.K. But it absolutely can change the course of the future by deciding to talk about it right now. 100%. O.K.

TYLER: I still think I want to collect my thoughts and I have no problem talking with you again. I am not gonna run and hide from you. I have nowhere to run and hide. I don't want to. I just want to be able to collect my thoughts and try and get dates and times and find out what exactly is going on. Is that fine?

BROCKWAY: Jeff you can leave at any time.

TYLER: Uh-huh.

BROCKWAY: O.K. I said that from the get-go.

TYLER: I know. But you also said that there was something that wasn't gonna fly where I couldn't leave. I don't know what that was supposed to imply.

BROCKWAY: No, I never said that you couldn't leave.

TYLER: Well you said there was one thing I could say that would change that. That is what I'm curious about.

BROCKWAY: Yup.

TYLER: What would that be?

BROCKWAY: That would be if you were to say that you felt like you wanted to hurt yourself.

TYTLER: Oh. No.

BROCKWAY: That would be the one scenario where you wouldn't be able to leave. O.K.

Tyler asked Brockway for his contact information, saying: "Why don't you give me your card and get me some time to arrange my thoughts. I have no problem reaching back out to you." Brockway then served Tyler with a temporary protection order that had been obtained by M.C. The entire recorded conversation lasted approximately 47 and ½ minutes. At the end of the conversation Brockway said that if they met up again to talk, Tyler would be leaving because "we have already kind of talked about the one thing where we would be leaving together and not separately."

## **DISCUSSION**

Tyler has argued that he was subjected to custodial interrogation, without *Miranda* warnings, from at least the point in his conversation with Det. Brockway when the detective created an ambiguity as to whether Tyler would be free to leave depending on what he said. The State, on the other hand, maintains that Det. Brockway made it clear that Tyler was not under arrest, Tyler knew he was not under arrest and any ambiguity inadvertently created by the detective did not render the encounter custodial in nature.

In *State v. Hopkins*, 2018 ME 100, ¶ 36, 189 A.3d 741, the Law Court reaffirmed its long-standing analysis of claims that a suspect was subject to custodial interrogation. Quoting *State v. Perry*, 2017 ME 74, ¶ 15, 159 A.3d 840, the Court stated: "When a person has been subjected to an in-custody interrogation but has not been advised of his *Miranda* rights, the State may not offer the statements made

7

during that interrogation against that person in its case-in-chief." *Hopkins*, 2018 ME 100, ¶ 36.

"In order for statements made prior to a *Miranda* warning to be admissible, the State must prove by a preponderance of the evidence, that the statements were made while the person was not in custody, or was not subject to interrogation." *State v. Bragg*, 2012 ME 102, ¶ 8, 48 A.3d 769 (*quoting State v. Bridges*, 2003 ME. 103, ¶ 23, 829 A.2d 247). *See also State v. Poblete*, 2010 ME 37, ¶ 21, 993 A.2d 1104.

The Law Court has stated that the "ultimate inquiry" regarding whether someone is in custody for *Miranda* purposes "is whether a reasonable person in the shoes of [Tyler] would have felt he or she was not at liberty to terminate the interrogation and leave or if there was a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Prescott*, 2012 ME 96, ¶ 10, 48 A.3d 218 (*quoting Poblete*, 2010 ME 37, ¶ 22, 993 A.3d 1104).

The test is "purely objective" and a variety of factors must be considered in their "totality, not in isolation." *Prescott*, 2012 ME 96, ¶ 11, 48 A. 3d 218; *State v. Dion*, 2007 ME 87, ¶ 23, 928 A.2d 746. The Law Court has consistently identified the following, non-exhaustive list of factors that are to be considered on the custody issue:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation, as a reasonable person in the defendant's position would perceive it;

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

Prescott, *2012 ME 96, ¶ 11, 48 A. 3d 218.*

The factors identified by the Law Court are not simply a checklist. Rather, they assist the trial court in assessing the overall setting and circumstances of an interrogation/interview to determine whether it is custodial in nature. Each side has pointed to some of the factors listed above as supporting their respective position regarding custody or the lack of it. For example, while the interview was conducted in the parking lot of a shopping center, it was inside a police cruiser. It was Det. Brockway who initiated contact with Tyler, but it was Tyler who chose the location and voluntarily drove there in his own vehicle to meet the detective.

In the court's view, the key element of the interview between Tyler and Brockway, relative to the issue of whether a reasonable person in Tyler's position would have felt free to terminate the interview and leave, occurred when Brockway explained that no matter what Tyler said, he was going to be leaving on his own, except for "one thing." The problem with what Brockway said to Tyler was that he did not further explain what that "one thing" was that Tyler might say that would change the ground rules and mean that Tyler would not be leaving on his own. Rather, Brockway immediately said: "But, for the most part if your story is somewhat similar to the other story I have, you are getting in your vehicle and you

are leaving and I am leaving. Two different directions. O.K.? Om, you are not under arrest. You are sitting here in your own free will." Brockway repeated again to Tyler that he was not under arrest and Tyler indicated that he understood.

Tyler, who was told in no uncertain terms by Brockway that he should listen carefully to the ground rules he was about to describe, clearly did listen carefully. When Brockway challenged him for being less-than -honest and deceptive, and said that his version of events did not match the story the detective had been told by M.C., Tyler expressed a desire to end the interview and "collect his thoughts," and he wanted to know if that was something he could do. Brockway did not immediately answer that question, but sought to persuade Tyler to talk now while the two of them were together. Tyler again said that he wanted to collect his thoughts, and wanted to know if that was "fine." It was at that point that Brockway reiterated that Tyler was free to leave at any time and that had been made clear to him from the "get-go."

Tyler, however, recalled that Brockway had said there was "one thing" he could say that would change whether he could leave and he sought clarification about that. It was then that Brockway told him it concerned whether he might harm himself.

Det. Brockway created an unnecessary ambiguity when he told Tyler that there was "one thing" he might say that could result in his not being able to leave on his own. More problematic, however, was the fact that he linked that "one thing," perhaps inadvertently, to whether Tyler's story was "for the most part" similar to the other story the detective had heard. Nevertheless, at the point in the interview when Brockway said that to Tyler, he was emphatic that Tyler was not under arrest, that he was there of his own free will, that he could leave at any time, that the doors to the cruiser were unlocked, and that Tyler was not going to be arrested. Tyler manifested his understanding of all of that and chose to continue speaking with the detective. The court finds by a preponderance of the evidence that from the

10

beginning of the interview to approximately 20:32 of the recording, Tyler was not subjected to custodial interrogation and a reasonable person in his position would have felt free to terminate the interview and leave.

At approximately 20:32 of the recorded interview is when Brockway told Tyler that he was not being "very honest with me." He later told Tyler that he was being deceptive, that the sexual relationship with M.C. began when she was 14, and that the story from M.C. was consistent with the results of the detective's investigation.

Once Brockway told Tyler that he was being dishonest and deceptive and, in essence, that his story was not "similar" to the other story the detective had, the earlier ambiguity ripened to the point that a reasonable person in Tyler's shoes would not feel that he was free to terminate the interview and leave. And, indeed, that appears to be what happened when Tyler asked if he could "collect his thoughts." For all practical purposes, he was asking if he could terminate the interview and leave, and he was unsure at that point in the interview because of the ambiguity created earlier by Det. Brockway.

Viewed in totality, and objectively, the court finds by a preponderance of the evidence that a reasonable person in the Defendant's position would have understood and believed that he was not in a custodial situation and that he was free to terminate the interview and leave up to approximately 20:32 of the recorded interview. From that point until approximately 31:19 of the recorded interview, however, the court finds that the State has failed to meet its burden of proof on the issue of custodial interrogation.[3]

---

[3] By 31:19 of the recorded interview, Det. Brockway had clarified for Tyler that he was free to leave and the "one thing" to which he had referred earlier was the possibility of self-harm. After 31:19 of the recording, Tyler clearly understood he

## CONCLUSION

The entry is: Defendant's Motion to Suppress is DENIED IN PART and GRANTED IN PART.

Dated: October 22, 2020

William R. Stokes
Justice, Superior Court

Entered on the docket 10/22/20

---

was free to leave and did so after being served with the temporary order of protection.