**STATE of Maine**

v.

**Cleveland James BARLOW, Jr.**

Supreme Judicial Court of Maine.

June 12, 1974.

---

Thomas E. Delahanty, II, County Atty., Auburn, for plaintiff.

Skelton, Taintor & Abbott by Charles H. Abbott, Lewiston, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WER-NICK and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

On April 15, 1971 the defendant, Cleveland J. Barlow, Jr., was charged in separate informations, authorized under 15 M.R.S.A., § 701 and Rule 7, M.R.Crim.P., with the crimes of assault and battery aggravated in nature (17 M.R.S.A., § 201) and robbery (17 M.R.S.A., § 3401). The Court below consolidated the cases for trial.

Pursuant to Rule 41(e), M.R.Crim.P., the defendant filed pre-trial motions to suppress for use as evidence certain items of property seized by the police on different occasions from the defendant's car, apartment and person. In addition thereto, he moved to suppress, in anticipation of its use at trial, any identification testimony by one Paul Caron, the victim of the robbery and aggravated assault with which the defendant stood accused.

After hearing, the presiding Justice ordered that the victim's identification testimony be not used at trial, but, respecting the defendant's other motions, he suppressed only the gun and bullet clip which the police had seized from the defendant's car and refused relief in connection with the other seized property.

Aggrieved by such rulings favorable to the defendant, the County Attorney, with the approval of the Attorney General, filed a notice of appeal for the State pursuant to 15 M.R.S.A., § 2115-A.[1] The presiding Justice treated the State's notice of appeal as a motion by the State for the report of the Justice's interlocutory order under Rule 37A(b)[2] and reported the issues. The defendant cross-appealed, raising the proprie-

---

1. 15 M.R.S.A., § 2115-A provides in pertinent part:

"An appeal may be taken by the State in criminal cases on questions of law, with the written approval of the Attorney General, from the District Court and from the Superior Court to the law court from a decision, order or judgment of the court suppressing evidence prior to trial . . . ."

2. Rule 37A(b), M.R.Crim.P. reads in part as follows:

"If the court is of the opinion that a question of law involved in an interlocutory order or ruling made by it in any action ought to be determined by the Law Court before any further proceedings are taken therein, it may, on motion of an aggrieved defendant or *when authorized by statute, upon motion of the attorney for the State*, report the case to the Law Court for that purpose and stay all further proceedings . . . ." (Emphasis supplied).

ty of the Court's order reporting the interlocutory ruling and claiming error in the denial of some of the relief prayed for in his motions to suppress. The Court below similarly treated the defendant's cross-appeal as a motion for report under Rule 37A (b) and reported those issues as well.

In this Court the only issues briefed and argued are the questions originally raised by the State challenging the grant of the defendant's motions to suppress. Issues neither briefed nor pressed in argument are deemed waived and abandoned on appeal. See, State v. Campbell, 1974, Me., 314 A.2d 398; State v. Devoe, 1973, Me., 301 A.2d 541; State v. Trott, 1972, Me., 289 A.2d 414. The same rule applies to cases before the Law Court on report. State v. Bull, 1969, Me., 249 A.2d 881, 883. We will confine our discussion to the issues briefed and argued.

A summary of the facts reveals that, on January 21, 1971 at about 5:30 p. m., one Paul Caron was beaten and robbed in his apartment in Auburn, Maine by a pistol-wielding assailant who, for the purpose of concealing his identity, had pulled a woman's silk stocking over his head and face.

Later that evening, Officer Charles Haskell, a detective with the Auburn Police Department, received a call from the Auburn dispatcher who informed him that Officer Schutt of the Lewiston Police had received an anonymous call saying that the perpetrator of the crime was an individual named Jimmy Johnson who could be found at the Holly Hotel in Lewiston with his blond girlfriend.

Detective Haskell then proceeded to the Holly Hotel accompanied by Detective Bolduc, also of the Auburn Police. They arrived at the hotel at approximately midnight and were met by Detective Ashburn of the Lewiston Department. At the hotel, the defendant, Barlow, was the only person seen sitting with a blond. Detective Haskell testified that the defendant fitted the general description given by Caron, although the transcript does not indicate the

specifics of the description reported. The officers learned, apparently from the defendant, that he used the name Jimmy Johnson. They informed him that he was a suspect in a robbery and asked if he would come to the Auburn Police station to answer some questions. Barlow testified that he had no objections.

Outside the hotel, Barlow was "frisked" for weapons. He was then put in the rear seat of the police car and taken to the Auburn police station. According to Officers Bolduc and Haskell, the defendant was then given complete "Miranda" warnings (the defendant testified that he remembered being advised of some, but not all, of his rights). At some point during the interrogation the Auburn Detectives learned from the Lewiston Police that the defendant's car had been located and that, through the window, a bullet clip could be seen protruding from underneath the driver's seat. The defendant was not informed of this discovery by the police. Barlow was asked, if he would consent to a search of the vehicle. He refused, saying the car was registered to his girlfriend and he was not sure whether or not he could permit a search. He was informed by the officers that his consent would be valid. Barlow, nevertheless, persisted in his refusal.

Officer Bolduc then announced that he was going to get a warrant and departed, apparently for that purpose. He later returned and, according to the defendant, stated that he could not "get ahold [sic] of anyone" to issue a warrant. Officer Haskell testified, however, that Bolduc had in fact contacted a Complaint Justice who refused to issue a warrant for insufficient probable cause. Officer Bolduc confirmed this on cross examination.

The officers then continued their efforts to obtain the defendant's consent to search. They persuaded the defendant to go with them to look at the car from the outside. According to the testimony of Officers Bolduc and Haskell, they told the defendant that, if they saw "anything suspicious,"

they would have a right to search the vehicle. At another point in his testimony, Officer Haskell stated that the defendant was told they would search the vehicle if they saw something suspicious. The defendant's version of the policemen's statements was to the effect that, if they saw anything suspicious, they could either search the car or obtain a warrant.

When the defendant and the officers arrived at the car parked outside the Holly Hotel, they were met by three or four Lewiston officers. The defendant remained near the police cruiser, while Officer Bolduc looked through the windows of the car with a flashlight. He allegedly spotted the bullet clip and summoned Officer Haskell and the defendant. Although Barlow made the comment that he could not see any bullet clip, Officer Bolduc then remarked: "I feel that the clip of bullets is suspicion enough for me to be able to look through the car." Barlow, however, quoted Bolduc as saying: "This gives me the right to search the car because of the circumstances of the evidence that we might find in it because of the bullet clip."

According to the defendant, he then responded: "Well, okay, if that is the way it is." He further testified that he voiced no objection, because he did not believe his objections would have made "much difference." According to Detective Bolduc, Barlow simply said: "All right."

It was at this point that Officer Bolduc entered the vehicle to seize the clip, whereupon Barlow informed him that a pistol would be found in the glove compartment. Bolduc took possession of the weapon and turned it over to Haskell. Barlow was then taken back in handcuffs to the police station in Auburn.

## VALIDITY OF THE WARRANTLESS SEIZURE OF THE GUN AND CLIP

The Justice below found that Barlow's ostensible consent to the search of the car and his disclosure to the police that there was a revolver in the glove compartment were neither a true consent nor a voluntary revealment, but merely evidenced withdrawal of resistance, and actual submission, on the part of the defendant to lawful authority in the belief that he was powerless to prevent a search of the car, a reasonable conclusion fully justified under the totality of the police procedures adopted in the instant case to obtain said consent.

We recognize that a search authorized by consent is constitutionally valid and not in derogation of the Fourth and Fourteenth Amendments to the Constitution of the United States. Schneckloth v. Bustamonte, 1973, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. Like principles are applicable under our State Constitution (Article I, Section 5). State v. Brochu, 1967, Me., 237 A.2d 418.

We further realize that State standards in testing the legality of a search and seizure can be no lower than the constitutional standards mandated by the Constitution of the United States as interpreted by the United States Supreme Court. See, State v. Hawkins, 1970, Me., 261 A.2d 255.

Whether a given consent to a search in a particular case was in fact voluntary or the product of duress, coercion, express or implied, is a question of fact to be determined from the totality of all the surrounding circumstances. Schneckloth v. Bustamonte, supra. No single criterion controls, but all factors must be taken into consideration in assessing the voluntariness of a consent.

Coercion which will invalidate consent and render a search unreasonable in constitutional reference is not solely confined to a consent obtained by threats or force, but is equally operative in those situations where the consent is granted only in submission to a claim of lawful authority.

In Bumper v. State of North Carolina, 1968, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.

2d 797, the Supreme Court held that a search cannot be justified as reasonable and lawful on the basis of consent when that "consent" has been given only after the official conducting the search has asserted an alleged authoritative right to search. The *Bumper* Court said:

> "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent."

> "Orderly submission to law-enforcement officers who, in effect, represented to the defendant that they had the authority to enter and search the house, *against his will if necessary*, was not such consent as constituted an understanding, intentional and voluntary waiver by the defendant of his fundamental rights under the Fourth Amendment to the Constitution." (Emphasis supplied). United States v. Elliott, 1962, D.C., 210 F.Supp. 357, 360 [quoted at footnote 14 in *Bumper*, supra].

Furthermore, in Hoffa v. United States, 1966, 385 U.S. 293, 87 S.Ct. 408, at 413, 17 L.Ed.2d 374, Mr. Justice Stewart asserted that

> "[t]he Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area."

■ It is a well established rule in the federal courts that a consent search is unreasonable under the Fourth Amendment if the consent was induced by deceit, trickery or misrepresentation of the officials making the search. United States v. Wallace, 1958, D.C., 160 F.Supp. 859; United States v. Ong Goon Sing, 1957, D.C., 149 F.Supp. 267; Smith v. Rhay, 1969, 9 Cir., 419 F.2d 160; United States v. Reckis, 1954, D.C., 119 F.Supp. 687 (dictum); United States v. Berkowitz, 1970, 1 Cir., 429 F.2d 921

(dictum); United States v. Robson, 1973, 9 Cir., 477 F.2d 13. In *Robson*, the Court conceded such to be the rule, but held that the mere failure of an Internal Revenue agent to disclose the potential criminal ramifications of a tax audit did not rise to an affirmative misrepresentation which the rule contemplates.

In Bolger v. United States, 1960, D.C., 189 F.Supp. 237, where the defendant was induced to sign a consent to search without consulting a lawyer on the representation by the government agents "that they had the right to search anyway," the Court held:

> "It is not necessary to have force or threat to vitiate a consent to search. Consent to search is not valid when based on misrepresentations made by government agents."

The case was reversed on other grounds. See, Bolger v. Cleary, 1961, 2 Cir., 293 F.2d 368; Cleary v. Bolger, 1963, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390.

■ Where an officer without using physical violence or threats conveys to the defendant by affirmative misrepresentations that he has the right to search without a warrant as in the instant case, the defendant's consent to the search given in response to such false assertions must be regarded as the mere submission of a law-abiding citizen to an officer of the law and cannot be construed as a valid waiver of his constitutional rights against an unreasonable search and seizure.

United States v. Curiale, 1969, 2 Cir., 414 F.2d 744, cert. denied, 396 U.S. 959, 90 S.Ct. 433, 24 L.Ed.2d 424, is distinguishable. In that case, the officer asked the defendant to sign a consent-to-search form. After reading it, the defendant remarked to the officer: "If I don't sign this, you are going to get a search warrant." The officer then told Curiale: "I don't want you to sign on that basis. If you are going to sign it, do it voluntarily." The Court viewed the officer's response as suf-

ficient to put the defendant on notice that his consent should not be conditioned on the availability or unavailability of a warrant and ruled that there was no duty to disclose there was insufficient evidence to get a search warrant at the particular moment in the continuing official investigation.

In the case at bar, Barlow undeniably was led to believe that the officers had a right to search the vehicle upon seeing the clip under the seat. Even though they might have thought, prior to their attempt to obtain a warrant, that the presence of the clip in the automobile gave them "probable cause" to support a search without a warrant, following the refusal by the Complaint Justice to issue one, the officers then must have realized that their representations to the defendant were incorrect and unfounded.

■ The fact that the search pertained to a motor vehicle did not dispense with the requirement of probable cause. State v. Fletcher, 1972, Me., 288 A.2d 92.

■ Absent a voluntary consent, the police, in the posture of their investigation at the time, did not have probable cause to search the car for any of the property used as a means of committing the robbery, such as the gun or a woman's stocking, nor for the money and strong-box taken in the hold-up. In State v. Fletcher, supra, we said that the information necessary to constitute probable cause must be such as would entitle a reasonable and cautious man to believe that the search would disclose the stolen articles or the weapon used which would in turn aid in the identification of the thief or robber. The test of "probable cause" is the existence of "reasonable grounds to believe."

■ We added, however, that *more evidence* is needed to justify an officer in making a search without a warrant than is required for finding probable cause for the issuance of a search warrant. State v. Hawkins, 1970, Me., 261 A.2d 255.

Disregarding the anonymous tip which lacked foundational factual basis and credibility criteria, the police could not reasonably conclude from the mere presence of a protruding gun clip under the seat of an automobile that the search of the car would probably result in the finding of the gun or other items involved in a robbery with which no evidence connected the vehicle, nor its operator or owner.

■ The burden of proof for justifying the lawfulness of a search upon consent lies on the State which, to satisfy the same, must prove that the consent was, in fact, freely and voluntarily given. Schneckloth v. Bustamonte, supra; Bumper v. State of North Carolina, supra. State v. Brochu, 1967, Me., 237 A.2d 418.

■ On a motion to suppress evidence alleged to have been illegally seized, questions of fact determined by the Court below are final unless shown to be clearly erroneous. State v. Brochu, supra. The presiding Justice was fully warranted in finding that Barlow did not freely and voluntarily consent to the search.

Though the point was not argued, we note that, in suppressing the fruits of this illegal search, no distinction should be drawn between the bullet clip, the pistol and the defendant's statement indicating the presence of the gun in the glove compartment. "[T]he policies underlying the exclusionary rule invite [no] logical distinction between physical and verbal evidence." Wong Sun v. United States, 1963, 371 U.S. 471, at 486, 83 S.Ct. 407, at 416, 9 L.Ed.2d 441.

### SUPPRESSION OF THE PROSPECTIVE IN-COURT IDENTIFICATION

The facts surrounding the issue whether Mr. Caron's expected in-court identification was properly suppressed by the Justice below will appear in the following narration.

After the seizure of the gun and clip from the automobile at the Holly Hotel in Lewiston, the Auburn officers removed Barlow in handcuffs to the Auburn station, where at approximately 3:00 a. m. Paul Caron, the robbery victim, was brought in "[t]o identify a man," so he testified. Caron was placed in one of three adjoining rooms with Detective Bolduc. The lights in this room were not on as were the lights in the immediately adjoining room. The defendant was caused to stand in the third adjoining room with Officer Haskell known by Caron to be a policeman. The lights were on in this room and the doors leading from one room to another were open so that the victim could see into the third room from his position in the first. Officer Haskell conversed with the defendant to permit a voice comparison by the victim. The officer conceded he did not advise Barlow of the purpose of their conversation. The defendant was unaware that anyone was listening or that he was being viewed for purposes of identification of the robber.

Mr. Caron, however, was not able at that time to identify the defendant as his assailant. He denied telling the officers that the defendant seemed too big, in which he was contradicted by the police. Nor was he able to identify the defendant's jacket Confronted with such indecisiveness, the officers released Barlow at about 5:00 o'clock that morning. They later, however, discovered additional evidence pointing to the defendant's participation in the robbery and on January 27, 1971 the defendant was re-arrested, but this time pursuant to a warrant of arrest.

Mr. Caron appeared in the District Court on the day of the defendant's preliminary hearing. As he entered the courtroom, Caron saw Barlow sitting in the back of the room wearing a crimson shirt with the word "jail" written across it. At the suppression hearing, he testified that it was "his face" on which he based his identification and that neither the "jail" shirt, nor the previous police-station confrontation had any bearing on his conclusion.

█ Upon these facts, the Justice below ruled that both confrontations, at the police station and at the preliminary hearing, were unfairly conducted and obviously unduly suggestive. He found that the State had not sustained its burden of showing any basis for a subsequent identification stemming from a source independent and apart from the prior improper viewings. We cannot say that it was clear error for him to suppress any in-court identification by Mr. Caron.[3]

Initially, we should discuss the propriety of testing the admissibility of testimonial evidence of identification by way of a pre-trial hearing in response to a motion to suppress, even though the issue has not been briefed nor argued. In State v. Perkins, 1971, Me., 275 A.2d 586, we held that a motion to suppress such testimonial evidence was not within the contemplated reach of either Rule 12 or Rule 41, M.R. Crim.P. We intimated, however, that the presiding Justice may, for the purpose of expediting the trial, hold a preliminary hearing on the admissibility of such testimony and make advance rulings thereon, but that such procedure was purely discretionary on his part.

The court must so conduct the trial as to prevent pre-trial confrontations structured in a setting unnecessarily suggestive and conducive to irreparable mistaken identification from tainting the truth finding process, and, in order to safeguard the accused's constitutional rights of due process

---

3. In suppressing the identification evidence the Court below also stated that the defendant should have been advised of his right to have counsel present at the pre-indictment police station viewing. At the time this ruling was made, our decisions had left that issue unresolved. Subsequent cases have made it clear that no such right attaches. State v. Rowe, 1974, Me., 314 A.2d 407; State v. Emery, 1973, Me., 304 A.2d 908; State v. Northup, 1973, Me., 303 A.2d 1; State v. Boyd, 1972, Me., 294 A.2d 459.

of law, we recommended in State v. Boyd, 1972, Me., 294 A.2d 459, that the procedure suggested by the Circuit Court of Appeals for the District of Columbia Circuit be adopted. See, Clemons v. United States, 1968, 133 U.S.App.D.C. 27, 408 F.2d 1230. This protective trial technique consists of eliciting the factual circumstances surrounding pre-trial confrontations and in-court identifications in an evidentiary hearing outside the presence of the jury to permit an advance ruling during trial but in the absence of the jury upon the identifications at issue.

■ We now hold that the trial court may, in its discretion, via the suppression motion and hearing, determine preliminarily prior to trial the validity of the pre-trial or in-court identification intended to be introduced at trial. This will serve the interests of expeditious judicial administration, safeguard the purity of the trial and allow the accused an advance viewing of the case against him.

We perceive little distinction between the identification technique used by the police at the original show-up at the police station in the instant case and the one-way mirrow viewing consistently condemned in our prior decisions. State v. Rowe, 1974, Me., 314 A.2d 407; State v. Northup, 1973, Me., 303 A.2d 1; State v. Boyd, supra; State v. LeBlanc, 1972, Me., 290 A.2d 193.

■ Although only darkness and open doors separated the defendant from the victim, the structured layout bore all the evil attributes of the one-way mirror arrangement. The defendant could not see into the room from which he was being viewed. He was not aware that anyone was listening to his voice. He was in fact presented singly and in a setting which marked him conspicuously as *the* suspect. No evidence was introduced to suggest circumstances so compelling and exigent as to have made reasonably necessary an identification effort in the middle of the night. It follows from our previous decisions that the police station viewing violated the defendant's right to due process of law.

The Court below suppressed any intented in-court identification of the defendant by Mr. Caron for use as evidence at trial. True, the suppressed identification evidence does not relate directly to the original police station confrontation conducted in violation of the defendant's rights of due process of law and Caron was unable to identify Barlow as a result thereof at the time. The presiding Justice, however, found that the first show-up had an impermissible influential impact on the ultimate conclusion of the witness, especially when viewed in connection with the obviously suggestive confrontation at the preliminary hearing in the District Court.

■ In-court identifications may be admitted despite an unlawful out-of-court confrontation, provided they have a source independent of the prior constitutionally impermissive viewing. State v. Rowe, supra; State v. Northup, supra; State v. Carlson, 1973, Me., 308 A.2d 294; State v. Levesque, 1971, Me., 281 A.2d 570, 576.

We found ample evidence of independent source in the reference cases.

In *Rowe,* we pointed out

"the length of time during which the witness observed the criminal at the commission of the crime, her close proximity to him, the bright lighting conditions in the bank, the witness' heightened observation due to her suspicions, her prior photographic identification and her confidence as to identification . . ." 314 A.2d, at 415.

In *Northup,* the victims had encountered their assailant in an extremely well lighted area and had been in his company for a substantial period of time; both girls had participated in face-to-face conversation with their attacker before and after the criminal acts; they were alert and intelligent youngsters who had demonstrated their perceptive ability by observing and

noting the registration number of their assaulter's automobile.

In *Carlson,* there was evidence that the victim had been face-to-face with the suspect for approximately 15 minutes during the commission of the crime, after which she gave a particularly detailed and accurate description of the defendant to the police such as his mustache, facial scar, height, hair color and clothing.

In *Rowe,* we further listed some of the factors to be considered in the determination of the existence of an independent source:

"1) [O]pportunity to view the criminal at the time of the commission of the crime;

2) freshness of the identification;

3) accuracy of the original description of the criminal;

4) adequacy of the lighting;

5) proximity of the criminal;

6) failure to identify other suspects;

7) promptness of the identification;

8) positiveness with which the identification is made;

9) existence of prior photographic identification."

■ In the instant case, the only evidence to support a finding of independent source is the victim's bare assertion that "you couldn't forget the face when you see it like that under them [sic] conditions, you couldn't forget it." He did testify at the suppression hearing that he relied for his identification particularly on the defendant's nose, eyebrows and cheeks, but the record fails to indicate that the victim had earlier reported to the police any distinctive facial characteristics of his assailant, except for "thin eyebrows". Addition-ally, the evidence is silent respecting the lighting conditions under which the victim first encountered his masked assailant, their relative positions and the time period during which Caron had the opportunity to observe the robber.

The Justice below had several evidentiary factors to which he could, and apparently did, attach great weight in his ultimate finding that any in-court identification of Barlow as the robber would be the result of the impact of the prior improper confrontations at the police station and at the preliminary hearing in the District Court, and in no way due to an independent resourceful memory. The failure of the witness to identify the defendant shortly after the crime at the initial viewing is certainly a relevant factor. See, United States v. Wade, 1967, 388 U.S. 218, 241, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149, 1165. Moreover, the Justice below was free to accept Officer Bolduc's testimony, although disputed, that Caron had affirmatively stated that the defendant was not "the same size" as his assailant. Furthermore, the inability on the part of Caron to recognize the defendant's jacket at the original viewing, plus the fact that the robber's features were distorted by the silk stocking that covered his face, were other factors entering into the Justice's decision. The record abundantly supports the conclusion reached by the Justice below and there was no error in suppressing any testimonial in-court identification by Mr. Caron at trial.

The entry will be

The State's appeal is denied. The defendant's cross appeal is dismissed for lack of prosecution.

The case is remanded for trial.

All Justices concurring.

DELAHANTY, J., did not sit.