STATE OF MAINE                              UNIFIED CRIMINAL DOCKET
YORK, ss.                                   YRKCD-CR-16-00474


STATE OF MAINE                  )
                                )
                                )
                                )
    v.                          )
                                )        ORDER DENYING
                                )        MOTION TO SUPPRESS
                                )
BRUCE AKERS,                    )
                                )
        Defendant.              )

Hearing was held on March 12, 2019 on defendant's motion to suppress. Defendant was present and represented by Attorneys Kristine Hanley and Valerie Randall. The State was represented by Assistant Attorney General Robert Ellis. The court heard testimony from two witnesses, Sergeant Steven Thistlewood and Deputy Robert Carr of the York County Sheriff's Office; and received in evidence numerous exhibits. Based on the testimony and evidence presented, and after consideration of legal memoranda submitted by counsel, the court hereby finds, concludes, and orders as follows.

## I. Facts

1. On the evening of June 9, 2016, Bruce Akers called the York County Sheriff's Office. He spoke with Sergeant Steven Thistlewood. They had known each other for over four years, principally through the local volunteer fire department; and had a friendly relationship.

2. Akers reported that he was missing some items, including tools and a six-pack of Smirnoff Ice. He suspected his neighbor, Douglas Flint, whom Akers had taken to the store earlier that day. Thistlewood offered to come out. Akers said he was all set and there was no need to respond. Akers did not call back.

1

*4/2/19 Docketed + sent to all parties.*

3. Around 6:45 pm the following day, June 10th, Thistlewood learned of a report of a missing person that had come into the Sanford Regional Communications Center. The missing person was identified as Douglas Flint of 546 Ossipee Trail in Limington. The caller was Flint's brother, Lloyd.

4. Thistlewood and Deputy Robert Carr went to the Flint home. Upon arriving, they met and spoke with Douglas Flint's daughter, Amanda; her boyfriend, Brian Bouffard; Douglas Flint Jr., Flint's son; and Aaron Flint, a cousin.

5. The family was very worried. When one of them tried calling Flint the prior evening, June 9th, he did not answer. Amanda said she works at the house during the day and had been there on June 9th. Her father was there. He had been drinking. She also said that Flint had recently become unemployed and was depressed to the point where they were concerned he might be suicidal. That was the reason the family had been checking in with him regularly.

6. Amanda also said that her father and the neighbor, Bruce Akers, had a longstanding feud. Flint felt that Akers had been encroaching on his (Flint's) property, and once discovered Akers in his (Flint's) pool. She said her father had cautioned her about Akers, whom Flint had described as "odd."

7. Thistlewood and Carr searched Flint's house. In the kitchen they observed that the TV was on, food was on the table, and his cigarettes and cell phone were there as well. They saw no sign of foul play.

8. Out of concern for Flint's well-being, and in particular the concern about his being potentially suicidal, Thistlewood and Carr conducted a grid search of the woods surrounding his house with attention to tree limbs overhead in case Flint may have hung himself. Their search brought them within sight of the abutting properties owned by Akers and by another neighbor.

2

9. The Akers property borders the Flint property; and the two parcels share a common driveway. Along the driveway leading into the Akers property after it splits off from the common driveway, there is a sign that reads, "Private Driveway Please Do Not Enter." There is no other evidence that the Akers property was posted for trespassers.

10. Thistlewood and Carr walked over a worn footpath through brush and along the edge of the woods to the Akers property. It was still daylight. As they went, they called out for Akers by name ("Bruce") multiple times. There was no response.

11. The path lead directly to two trailers (one white, one red) in close proximity and surrounded by piles of scrap metal, refuse, and miscellaneous materials. The white trailer was a "Chateau" brand Camper ("Camper"). A red pick-up truck was parked at the end of the dirt driveway, close to the red trailer. State's Exhibits 5-12 depict the relative positions of the Camper, the red trailer and the red pick-up truck from various distances and angles.

12. Thistlewood thought he heard a noise, perhaps from a small animal, coming from within the Camper. He paused; the noise stopped. The door to the Camper was locked by a padlock on the outside. A tarp hung over the door. Thistlewood knocked on the door. There was no response. He looked in a window but was unable to see anything.

13. Carr inspected the red trailer. Its door was also padlocked from the outside. Carr attempted to look in a window but was unable to see anything. He knocked on the door and got no response.

14. Thistlewood was aware that Akers raised dogs. He and Carr walked down another foot path toward the dogs to see if Akers might be there, continuing to call out defendant's name as they went. They encountered another neighbor with whom they spoke briefly; then returned to the area where the two trailers were located.

3

15. Approaching the trailers, Thistlewood again briefly thought he may have heard the same noise coming from inside the Camper. Carr did not hear it.

16. Thistlewood and Carr walked back to the Flint property. They put police tape on the door. By this point, they had been on site for about an hour.

17. Both officers left to attend to other calls but returned again to the Flint property just after midnight in the early morning hours of June 11th. They encountered another family member, intoxicated and visibly upset. Sergeant Matt Nadeau was radioed for back-up. The police tape on the Flint home door was intact, indicating that Flint had not returned.

18. Thistlewood, Carr, and Nadeau walked over to the Akers property again via the same footpath. It was dark so they used flashlights to illuminate the path. They announced their presence, calling out for Akers. There was no response. The red pick-up truck was still at the end of the driveway where it had been parked earlier in the evening.

19. Thistlewood heard a noise coming again from inside the Camper—this time a distinct, loud thud which did not sound like a small animal but perhaps a person inside. Carr also heard the noise and came to assist. They did not know that it was Akers. The door to the Camper was still padlocked from the outside. The officers still did not know the whereabouts of Flint.

20. At this point, Thistlewood and Nadeau were at the front of the Camper, which had a large window with a hinged weather cover in the down position. They lifted the cover and shined a flashlight through the window into the Camper. Thistlewood saw a person on the floor in a sleeping bag beginning to get up.

4

21. Carr was on the side of the Camper, to the right. Through a window he could see in the beam of the flashlight the figure of a man beginning to stand up from behind a half wall.

22. Thistlewood recognized the man as Akers; called out, "Bruce; identified himself; told Akers he needed to talk with him; and asked if Akers would come outside.

23. Akers agreed to come outside; said he needed to get dressed and get some things; and also said he was unarmed. As Akers got up and dressed, Thistlewood kept the flashlight on him to assist. There were no lights in the Camper.

24. Akers looked for the keys to unlock the padlock on the door. He grabbed his phone and phone charger.

25. Akers was unable to find the keys and said he would have to force the door. He tried prying the door with a hammer from the inside but was unsuccessful. He asked Thistlewood to help and gave him the hammer. Thistlewood was able to pry off the padlock from the outside.

26. The officers held up the tarp in front of the door and Akers came outside. The area around the Camper was cluttered. It was dark. There were no lights.

27. Thistlewood began recording the event on his cell phone from this point forward.

28. A portion of this recording was entered into evidence. State's Exhibit 1 consists of the first 28 minutes and 30 seconds recorded, beginning at the point Akers emerged from the Camper and running up to his arrival at the Limington substation. The recording captures the interaction between Akers and the officers throughout this time period. The first several minutes of the recording contain the interaction between Akers and Thistlewood after Akers exited the Camper. Akers was alert, calm, composed, cogent, rational, and responsive.

5

29. After Akers came out of the Camper, Thistlewood asked, "Which way do you want to go, Bruce?" Akers indicated a direction. Thistlewood turned around and used his flashlight to assist. They walked about 30 feet to a flatbed trailer. Thistlewood asked, "Bruce, where can we have a seat and talk for a minute? We have some business to take care of, right?" Akers responded, "I guess so."

30. Akers sat down on the flatbed. Thistlewood asked, "Can I sit next to you?" Akers said, "Sure." Carr and Nadeau remained standing, about 10 feet away in an area open enough to spread out.

31. Thistlewood asked, "You know why we're over here, right?" When Akers did not respond, Thistlewood asked again and Akers replied, "Yeah. Probably. Yeah."

32. Thistlewood asked, "Where is he?" Akers did not respond.

33. Thistlewood then asked, "Can I ask you something?" Akers said, "Yeah." Thistlewood asked, "Is he alive?" Akers shook his head, indicating no.

34. Thistlewood then said that he was going to get some paperwork and make a phone call. He asked Akers, "Can you bring us to him?" Akers said, "I can."

35. The total time that had elapsed from his exit from the trailer to the point he gave the foregoing response was less than two minutes.

36. At this point, Thistlewood stated they would not ask any more questions and directed Akers to stand and put his arms up so that he could be searched. He conducted a brief search for weapons. Akers stated again he did not have a weapon or own any firearms.

37. While being searched, Akers stated spontaneously and without any prompting, "The guy just wouldn't leave me alone."

6

38. Thistlewood asked if either of the other two officers had a *Miranda* card, as it was his intent to read Akers his rights. Nadeau said, "We're going to do everything by the book."

39. While conducting a search of Akers, Thistlewood asked if Akers has any needles on him. Akers said no; and then became momentarily disturbed when some items from his pockets fell to the ground.

40. Thistlewood then told Akers that they are going to take him to the substation and have an investigator come out.

41. Thistlewood read Akers his *Miranda* rights, pausing after each one to confirm that Akers understood. Akers acknowledged that he understood each of the rights recited. Thistlewood then asked, "Having all those rights in mind, do you want to answer some questions?" Akers said, "No."

42. Akers is told again that they will take him to the substation where a detective will talk with him.

43. Thistlewood and Carr leave to go to the cruiser. Akers is left solely in Nadeau's custody.

44. While waiting for the cruiser to arrive, Nadeau and Akers engaged in general conversation—about his dogs, family and work. Akers was calm and cogent throughout. At one point, Nadeau said, "We'll get you through this man, I promise, OK?" Akers responded, "Yep. Thank you. It's nothing I wanted to ever happen. I'm the most peaceful guy you ever met." Nadeau then said, "Sometimes people put situations in our court and we have no choice but to . . . how we handle them. I get it. I totally get it."

45. The cruiser arrived in about six minutes. Thistlewood again confirmed that Akers had no weapons. He directed Akers into the backseat of the cruiser, without handcuffs. Carr also got in the back seat.

7

46. Without prompting, Akers said, "It's not the best day of my life."

47. A few minutes later, the cruiser departed for the Limington substation. The ride took approximately five minutes.

48. About two minutes into the ride there was a brief conversation about the dogs, and whether they would need to be fed.

49. Then, again without prompting, Akers said, "I actually would have called you guys right away but I wanted a few hours of freedom, and enjoy it. I can't say I enjoyed it that much, but . . . ."

50. Upon arriving, Akers was lead into the substation and seated. Maine State Police Detective Corey Pike arrived subsequently and re-read *Miranda* rights to Akers.

51. Akers asked for a lawyer before answering questions.

52. Later that morning, at 8:45 am, a search warrant was issued on the basis of an affidavit prepared by Detective Pike. See Defendant's Exhibit 2. The warrant authorized a search of the Akers residence and property at 540 Ossipee Trail in Limington and vehicles in the driveway. The supporting affidavit recited facts that included statements made by Akers, including the statements reflected in paragraphs 33, 34, 37, and 49 above.

## II. Discussion

Defendant moves to suppress statements he made to law enforcement officers in the early morning hours of June 11, 2016 as well as physical evidence subsequently obtained as a result of a search warrant that was based, in part, on those statements. He contends that his statements and physical evidence were the result of an unlawful search in violation of his rights under the Fourth Amendment of the U. S. Constitution

8

and Article I, Section 5 of the Maine Constitution,[1] and therefore should be suppressed as "fruit of the poisonous tree." In addition, he contends his statements were the product of unwarned, custodial interrogation in violation of *Miranda v. Arizona* and/or were involuntary, and therefore admission at trial would violate his privilege against self-incrimination under the Fifth and Fourteenth Amendments of the U. S. Constitution and Article I, Section 6, of the Maine Constitution.[2]

## A. Fruit of the Poisonous Tree

Akers argues that the officers' actions on the evening of June 10th and the early morning hours of June 11th—entering and searching the area around the Camper, looking into windows of the Camper and the other trailer, lifting the weather cover of the Camper window and shining a flashlight inside—constitute, individually or collectively, an illegal, warrantless search within the meaning of the Fourth Amendment. He seeks to suppress statements he made and all physical evidence obtained as a result of a subsequent search pursuant to a warrant based, in part, on those statements.

### 1. Search Not Unreasonable

The Fourth Amendment protects the right of persons to be secure in their home against unreasonable searches, and this protection extends not only to the interior of a dwelling, but to its curtilage, land immediately surrounding and associated with the home. *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018); *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *State v. Sullivan*, 2018 ME 37, ¶ 10, 181 A.3d 178; *State v. Boyington*, 1998

---

[1] Article I, section 5 of the Maine Constitution provides protections that are coextensive with the Fourth Amendment of the U. S. Constitution. *State v. Martin*, 2015 ME 91, ¶ 17, n.2, 120 A.3d 113.

[2] Article I, Section 6, of the Maine Constitution has been interpreted to provide a broader scope of protection with respect to the privilege against self-incrimination based not only on police conduct but also on the independent consideration of an individual defendant's mental capacity. *See State v. Rees*, 2000 ME 55, ¶¶ 7-9, 748 A.2d 976.

ME 163, ¶ 6, 714 A.2d 141. The search of a home without a warrant is presumptively unreasonable. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *State v. Melvin*, 2008 ME 118, ¶ 6, 955 A.2d 245.

The Fourth Amendment's ultimate touchstone, however, is "reasonableness;" and the warrant requirement is subject to exceptions. *Brigham City*, 547 U.S. at 403; *Sullivan* 2018 ME 37, ¶¶ 10-11, 181 A.3d 178. One recognized exception is the "emergency aid doctrine," which permits law enforcement officers in certain circumstances to enter or search a dwelling without a warrant in order to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 404-05; *see also* 3 Wayne R. LaFave *Search and Seizure* § 6.6(a), at 600, nn.22-23 (5th ed. 2012) (Under "emergency doctrine," probable cause requirement applied by reference to circumstances confronting law enforcement at the time, including need for prompt assessment of ambiguous information concerning potentially serious consequences).

This exception does not depend upon an officer's subjective intent, but requires an objectively reasonable belief that there may be an immediate need to render aid or assistance to a person within a dwelling. *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam); *Brigham City,* 547 U.S. at 403. This exception has been applied in the context of a search for a missing person. *E.g., People v. Wharton*, 809 P.2d 290 (Cal. 1991); *State v. Epperson*, 571 S.W.2d 260 (Mo. 1978); *People v. Mitchell*, 347 N.E.2d 607 (N.Y. 1976); *see also State v. St. Yves*, 2000 ME 97, ¶ 19, n.8, 751 A.2d 1018 (officers justified in searching defendant's home for a missing infant without a warrant).

It is the State's burden to prove by a preponderance of the evidence the existence of circumstances excusing the requirement for a warrant. *See State v. Palmer*, 2018 ME 108, ¶ 12, 190 A.3d 1009 (quoting *State v. Arndt*, 2016 ME 31, ¶ 9, 133 A.3d 587).

10

Based on the record developed at hearing, the State has shown it more likely than not that the officers were justified in entering the Akers curtilage a conducting a limited search in the early evening hours of June 10th; and also in returning to the Akers property later that night and lifting the weather cover on the window to look inside the Camper.

Earlier in the evening, Thistlewood and Carr were searching for a potentially suicidal person who appeared to have vanished abruptly. After searching the Flint home and property, it was reasonable to go over to the neighboring property to look for Flint and/or speak with Akers. They announced their presence; called out for Akers by name; found no one present; and saw two trailers padlocked from the outside. In these circumstances, it was reasonable for them to look around the area and check the trailers to see if there was any sign of Flint.

It was also reasonable for them to return to the Akers property several hours later when it was clear that Flint had not returned. Speaking with Akers, if he were there, might assist their search for Flint. They did not enter onto his property in a clandestine manner, but again announced their presence and called out for Akers by name. Although the same pick-up truck was there, there was no response. The Camper and other trailer were still padlocked from the outside. Upon hearing noises coming from inside the Camper, it was reasonable in the circumstances for them to investigate. They did not know it was Akers inside; it might well have been Flint.

It is immaterial that, in hindsight, there turned out to be no emergency. *See Fisher*, 558 U.S. at 49. To the extent defendant suggests the officers had an ulterior motive in searching the trailer (i.e. gathering evidence pertinent to a criminal investigation) the evidence does not support this contention. Moreover, the test the court is bound to apply is one of objective reasonableness. *See Brigham City*, 547 U.S.

11

at 405. The court concludes that the search of the Akers property and Camper was reasonable under the circumstances.[3]

## 2. Even if Search Unlawful, Suppression not Justified

Even where a search is deemed unlawful under Fourth Amendment principles, the fruits of the search are not automatically subject to suppression. *Brown v. Illinois*, 422 U.S. 509, 599-600 (1975); *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016); *State v. Bailey*, 2012 ME 55, ¶ 16, 41 A.3d 535. Despite its purpose, the exclusionary rule does not prohibit use of illegally seized evidence in every instance. *State v. Trusiani*, 2004 ME 107 at ¶ 20, 854 A.2d 860. "[T]o determine whether the constitutional violation and evidence subsequently obtained after a consent have a strong enough connection to classify the evidence as 'fruit of the poisonous tree[,]'" the court must consider five factors:

> (1) the voluntariness of the consent; (2) the proximity in time between the constitutional violation and the discovery of the evidence; (3) whether intervening circumstances were present; (4) the purpose and flagrancy of police misconduct; and (5) whether the police complied with *Miranda* . . . .

*Id.* ¶ 21 (citing *Brown*, 422 U.S. at 603-04; *State v. Boyington*, 1998 ME 163, ¶ 10, 714 A.2d 141). The factors apply to confessions as well as non-testimonial evidence. *State v. LeGassey*, 456 A.2d 366, 368 (Me. 1983). After balancing these factors, the court concludes suppression of defendant's statements is not justified.

Two factors—factor two (proximity in time) and factor three (intervening circumstances)—weigh in defendant's favor. Defendant seeks to exclude three statements during the initial interchange with Thistlewood made within a matter of minutes after his exit from the Camper as well as statements made in the cruiser

---

[3] The State also contended that the "inevitable discovery" exception further supports not suppressing physical evidence obtained under the warrant subsequently issued in this case. The court does not address this argument.

approximately over 20 minutes later.[4] All of them occurred proximate in time to his being found in the Camper. *See Strieff*, 136 S. Ct. at 2062 (discovery of contraband "only minutes after illegal stop" held to "favor[] suppressing the evidence."); *Brown*, 422 U.S. at 604 (confession suppressed when less than two hours between illegal arrest and confession). Further, this case does not present the type of "intervening circumstances" that the Supreme Court has suggested weigh against suppression, at least with respect to his initial statements made upon exiting the Camper. *See, e.g., Strieff*, 136 S. Ct. at 2062 (following illegal detention of suspect police discovered valid arrest warrant for an unrelated matter predating detention); *Johnson v. Louisiana*, 406 U.S. 356, 365 (1972) (taint of illegal arrest purged by intervening arraignment where defendant advised of his rights, bail set, and counsel appointed).

The remaining three factors weigh against suppression.

Factor one examines voluntariness of consent. The analysis of voluntariness in the context of the privilege against self-incrimination under the U.S. and Maine Constitutions in Section II(C), below, is also relevant here. In addition, though, "*Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" *Brown*, 422 U.S. at 602 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

There are two dimensions of "consent" in this case—consent to come out of the Camper and then consent to speak with the officers. The evidence, even when held to the higher standard in Section II(C), below, establishes that Akers freely chose to exit

---

[4] The statements made initially outside the Camper were his acknowledgement of Flint's condition, his ability to locate the body, and his expression of frustration with Flint. See Section I, ¶¶ 33, 34, and 37. The statements made later in the cruiser were his statements about this not being "his best day" and his not having called police earlier because he "wanted a few hours of freedom . . . ." See Section I, ¶¶ 46, 49. The statements referenced in the search warrant affidavit were those reflected in ¶¶ 33, 34, 37, and 49.

13

the Camper. He was not compelled to do so. Thistlewood, whom he knew, told Akers he needed to talk with him and asked him if he would come outside. Akers agreed. And the evidence also establishes that Akers freely chose to speak with Thistlewood and answer his questions, at least up to the point where he elected to invoke his *Miranda* rights.

Consent is not voluntary if induced by "deceit, trickery or misrepresentation of the officials making the search" or if the defendant is "essentially given no choice due to the initial police conduct." *Bailey*, 2012 ME 55, ¶ 18, 41 A.3d 535 (quoting *State v. Barlow*, 320 A.2d 895, 400 (Me. 1974)) (citing *United States v. Collins*, 510 F.3d 697, 701 (7th Cir. 2007)). That is not the case here. Akers was not coerced or tricked—either to exit the Camper or to speak with Thistlewood. The officers came onto the property openly, repeatedly calling out for Akers. Thistlewood identified himself immediately upon discovering Akers in the Camper. In his interactions with Akers, Thistlewood, though clear about his purpose, was not directive but rather solicited consent from Akers to come out of the Camper, find a place to go, sit next to him, and ask him questions.

The testimony of Thistlewood and Carr, which the court found credible, and State's Exhibit 1 (the recording of the event starting when Akers exited the Camper) establish that officers did not employ deceit, trickery, or misrepresentation; and that defendant was alert, calm, composed, and cooperative with the officers throughout the encounter, from beginning to end. Factor one, therefore, does not weigh in favor of suppression.

Factor four (purpose and flagrancy of police misconduct) and factor five (compliance with *Miranda*) also do not support suppression. Factor five is addressed below in Section II(B). Although compliance with *Miranda* (or any one single *Brown*

14

factor, for that matter) is not in and of itself sufficient to dissipate the taint of a Fourth Amendment violation and avoid suppression, *Brown*, 422 U.S. at 602-03, consideration of this factor coupled with factor one, above, and factor four as discussed below weigh substantially against suppression.

Factor four is given considerable weight in this calculus, given the deterrence rationale underlying the exclusionary rule. *See id.* at 604 ("particularly, the purpose and flagrancy of the official misconduct . . . ."); *Trusiani*, 2004 ME 107, ¶¶ 24-25, 854 A.2d 860 ("the purpose and flagrancy of the police misconduct is often characterized as a very important factor when determining whether the evidence should be suppressed."). Here, for the reasons discussed above in Section II(A), the court does not find that the officers acted in bad faith or with purposeful malfeasance. Even if the decision made in the moment to lift the weather cover and look inside is deemed retrospectively to be unreasonable, it was not flagrant misconduct given what the officers knew at the time and the potential that the noise from within the Camper could have been those of the person missing.

The exclusionary rule seeks to deter "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. U.S.*, 555 U.S. 135 (2009); *see also Brown*, 422 U.S. at 605 (officers broke into and searched defendant's apartment without a warrant; arrested him without a warrant or probable cause; took him to the station; then warned him of his rights before he made inculpatory statements). Based on the evidence, the officers did not engage in conduct of that nature. Therefore, even if the search is deemed a Fourth Amendment violation, suppression of defendant's statements is not supported in this instance.

15

## B. *Miranda*

A person subjected to interrogation while in police custody must first be given a *Miranda* warning, otherwise statements made in the course of that interrogation are inadmissible at trial. *State v. Bryant*, 2014 ME 94, ¶ 8, 97 A.3d 595; *State v. Swett*, 1998 ME 76, ¶ 4, 709 A.2d 729; *State v. Holloway*, 2000 ME 172, ¶ 13, 760 A.2d 223 (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). It is the State's burden to prove by a preponderance of the evidence that Akers was not subject to a custodial interrogation or that law enforcement otherwise complied with *Miranda* requirements. *State v. Prescott*, 2012 ME 96, ¶ 10, 48 A.3d 218.

Defendant claims his *Miranda* rights were violated and seeks to suppress three statements made outside the Camper[5] as well as statements made later while in the cruiser.[6]

### 1. Statements Outside Camper

Akers was not in custody at the time that he made the initial statements to Sergeant Thistlewood outside the Camper. The standard for determining custody is whether a reasonable person standing in the shoes of the defendant at the time would have felt he or she was not at liberty "to decline the officers' requests or otherwise terminate the encounter." *State v. Lowe*, 2013 ME 92, ¶ 16, 81 A.3d 360 (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991); *State v. Jones*, 2012 ME 126, ¶ 22, 55 A.3d 432) (internal quotation marks and alterations omitted). The test is an objective one, and in making this objective determination, the court looks to a number of factors for guidance, including:

> (1) the locale where the defendant made the statements; (2) the party who initiated the contact; (3) the existence or non-existence of probable cause

---

[5] See Section I, ¶¶ 33, 34, and 37, *supra.*

[6] See Section I, ¶¶ 46, 49, *supra.*

to arrest (to the extent communicated to the defendant); (4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it); (7) whether the suspect was questioned in familiar surroundings; (8) the number of law enforcement officers present; (9) the degree of physical restraint placed upon the suspect; and (10) the duration and character of the interrogation.

*State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222.

Applying these factors, the court determines that Akers was not in custody for purposes of *Miranda* at the time he made initial statements about Flint's condition (Section I, ¶ 33) and his ability to locate him (Section I, ¶ 34). The police initiated this contact and a reasonable person in his position would have perceived that their purpose was to investigate Flint's disappearance. The contact, however, took place at Akers' home and in his yard; he was familiar with the surroundings, and chose the specific place to speak with Thistlewood. The officers did not communicate that they had probable cause to suspect Akers of wrongdoing. There were two other officers present, but they stood in the dark, ten feet away from where Akers and Thistlewood were sitting. Akers knew and had a friendly relationship with Thistlewood. Akers was not under any physical restraint. The duration of the interaction with Thistlewood was very brief. Although Thistlewood expressed a clear interest in speaking with him, there was no coercion or compulsion to do so nor any indication that Akers was not allowed to decline. Akers willingly exited the Camper and, as is clear from State's Exhibit 1, willingly spoke with Thistlewood.

Because Akers was not in custody, there was no *Miranda* violation with respect to the statements made in response to questions about his knowledge of Flint's condition and Flint's whereabouts.

17

Akers was effectively in custody, however, immediately after this latter statement. At that point, Thistlewood had discovered that Flint was not alive and Akers knew the location of the body. Akers clearly became a suspect at that point. *See State v. Lowe,* 2013 ME 92, ¶ 11, 81 A.3d 360. Thistlewood expressly stated he would ask no more questions; and he directed Akers to stand in order to be searched. During the search, and before being advised of his rights, Akers spontaneously made the statement that Flint "just wouldn't leave [him] alone" (Section I, ¶ 37). Because this statement was not made in response to a question and was freely volunteered by Akers, it did not violate *Miranda,* even if it was made while in custody.

Finally, even if defendant was in custody at the time he made these initial statements, they do not constitute a *Miranda* violation. The questions Thistlewood posed fell within the administrative/public safety exception, which allows law enforcement to solicit information concerning the whereabouts of missing victims, and therefore were permissible. *State v. Lockhart,* 2003 ME 108, ¶ 18, 830 A.2d 433; *State v. White,* 619 A.2d 92, 94 (Me. 1993).

### 2. Statements in Cruiser

The statements made by Akers in the cruiser concerning this "not being his best day" (Section I, ¶46) and his not calling police earlier because he "wanted a few hours of freedom" (Section I, ¶49) were made while Akers was in police custody. The evidence establishes, however, that both statements were spontaneous, were not made in response to questions posed by the officers, and were made subsequent to *Miranda* warnings having been given, (and invoked).

Defendant contends that after the *Miranda* warnings were given, the officers pressured him in subtle ways by engaging him in conversation about his dogs, his

18

family, his work, and other topics all in an effort to coax a confession from him. The court rejects this contention.

First, there was no bar under *Edwards v. Arizona* against the officers continuing to talk with defendant. When Akers invoked his *Miranda* rights initially after being so advised, he did not request counsel but simply stated he did not want to answer any more questions. *See Edwards v. Arizona,* 451 U.S. 477 (1980).

Second, the officers in the cruiser were not interrogating Akers nor were they engaging in conduct to "undermine the efficacy of the *Miranda* warnings. *See State v. Nightingale,* 2012 ME 132, ¶ 29, 58 A.3d 1057. Thistlewood and Carr engaged Akers in limited conversation, principally to ask about practical concerns (Had Akers buckled his seat belt? Were his dogs going to need feeding?) The statements in the cruiser were made spontaneously, without prompting, and not in response to any question posed.

There was a period of about 20 minutes in which Sergeant Nadeau was alone with Akers, waiting for Thistlewood and Carr to return with the cruiser. Nadeau briefly engaged Akers in limited conversation during this period, all of which was recorded. *See* State's Exhibit 1. There was no attempt to engage in any form of interrogation about Flint or the circumstances surrounding his disappearance. Akers had been left in Nadeau's sole custody. Nadeau's attempt at conversation appears to have been directed toward keeping the situation under control by talking with Akers primarily about personal matters, and not an effort to trick him into talking about the incident. Although Nadeau did at one point offer words of support to Akers,[7] based on the totality of the evidence the court does not find that this constituted a ploy to undermine the efficacy of the prior *Miranda* warnings, *see id.,* or the making of the kind of specific

---

[7] See Section I, ¶ 44, *supra.*

19

promises or inducements intended to elicit incriminating statements, *see State v. Hunt*, 2016 ME 172, ¶ 38, 151 A.3d 911.

Therefore, the court concludes there was no violation of defendant's *Miranda* rights.

## C. Voluntariness of Statements

Defendant contends that the statements in issue were made involuntarily and therefore violate his right against self-incrimination. The State bears the burden of proving voluntariness beyond a reasonable doubt. *State v. Bryant*, 2014 ME 94, ¶ 15, 97 A.3d 595; *State v. Dion*, 2007 ME 87, ¶ 33, 928 A.2d 746. The determination of voluntariness is made in light of the totality of the circumstances by evaluating "both external and internal factors" such as

> the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173. Moreover, in light of defendant's invocation of Article I, Section 6, of the Maine Constitution and his contention that the officers used subtle forms of pressure or trickery,[8] his age, physical and mental condition, emotional condition, and conduct are of particular importance. *Hunt*, 2016 ME 172, ¶ 38, 151 A.3d 911; *Rees*, 2000 ME 55, ¶¶ 7-9, 748 A.2d 976. Here, the totality of the circumstances establishes beyond a reasonable doubt that defendant's statements were made voluntarily.

---

[8] The court does not find that the officers engaged in deception, trickery, or coercive practices to induce a confession from Akers. See Section II(B)(2), *supra.*

20

Akers was approximately 58 years of age in June 2016. There is no evidence that he was mentally, physically, or emotionally impaired at that time. It is clear from State's Exhibit 1 (the recording) that Akers was alert, composed, stable, aware of his situation, and oriented to time and place. On the recording, which ran approximately 28 minutes, he spoke clearly and articulately, and showed no sign of being under the influence of any substances.

The statements outside the Camper[9] were made in his own yard, sitting on or standing by a flatbed trailer about 30 feet from the Camper. His conversation with Thistlewood, whom he had known for several years, was cordial and very brief—lasting only a minute or two in duration. Akers was not physically restrained. Although two other officers were present, they were standing ten feet way in the dark. At the time Akers made the first two statements, he was not in custody and Thistlewood's initial questioning did not constitute "interrogation;" the third statement was a spontaneously and freely made, and was in response to any question posed. No threats, promises, or inducements were made. This did not amount to "an atmosphere of coercion" as defendant claims. Although Thistlewood expressed a need to speak with Akers and repeated a question or two, he was not aggressive, threatening or overbearing.

In addition, for many of the same reasons, the statements made later in the cruiser[10] were also free and voluntary. The immediate circumstances and surroundings had changed—Akers was now in custody, though not physically restrained; he was in the sitting in the backseat of a police cruiser, being transported to the Limington substation; and he knew he was being held in connection with Flint's disappearance. It is clear, though, from State's Exhibit 1 (the recording) that Akers remained alert, calm,

---

[9] See Section I, ¶¶ 33, 34, 37, *supra.*

[10] See Section I, ¶¶ 46, 49, *supra.*

21

and keenly aware of his situation. The officers were not interrogating him. As discussed above, there was limited conversation related to practical concerns. The statements made by Akers in the cruiser were made spontaneously, without prompting, not in response to any question posed, and after he had been previously advised of his *Miranda* rights. And, as discussed above, the officers did not employ deceptive practices to lure Akers into making incriminating statements.

The State has met its burden of proving beyond a reasonable doubt that the defendant's statements were the free choice of a rational mind, fundamentally fair, and not a product of coercive police conduct.

### III. Order

Accordingly, the court hereby orders and the entry shall be as follows: "Defendant's motion to suppress is DENIED."

The clerk may incorporate this order upon the docket by reference.

SO ORDERED

Dated: April 1, 2019

Wayne R. Douglas
Justice, Superior Court

22